Mode *v.* Barnett, Adm'x

5-2786                                    361 S. W. 2d 525

Opinion delivered November 5, 1962.

*Hardin, Barton & Hardin,* for appellant.

*Gordon & Gordon, Howell, Price & Worsham,* for appellee.

Carleton Harris, Chief Justice. This litigation stems from the killing of D. L. Russell by Lee Mode, ap-

pellant herein.[1] Suit was instituted by Clida Russell Barnett, Administratrix in Succession of the estate of D. L. Russell, and as Guardian and next friend of Jerry Russell, Don Russell, Ferrell Russell and Darrell Russell, minor sons of the deceased. Count I of the complaint alleged that Russell and his wife, Mildred Sellars Russell, lived happily together as man and wife for more than 15 years until the fall of 1957, at which time appellant, Lee Mode, commenced making clandestine visits to Mrs. Russell, showering his affections and attentions upon her in an effort to entice her favor; that Mode did willfully and wickedly steal and alienate her affections, and about the 18th day of April, 1958, lured her away from her children and her husband, causing her to desert and abandon the children and to separate from their father; that since said date, Mode and Mrs. Russell had been living together, and that the children had been injured and damaged by being deprived of the comfort, companionship, love, affection and society of their mother. Actual damages were sought on this count in the sum of $100,000, together with punitive damages in the sum of $50,000.

Under Count II, it was alleged that Mode, after learning that D. L. Russell was attempting to effect a reconciliation with his wife, and after deliberation and premeditation, killed Russell on October 13, 1958, by shooting the latter on the streets of Conway; that the children had been deprived of their father's support, contributions, and future earnings, and as a result of his wrongful death, had suffered extensive grief, mental pain and anguish; **that they had been deprived** of the companionship, love and affection of their father and had been damaged in the sum of $100,000. $100,000 in damages was sought as actual damages to the estate, together with $50,000 punitive damages. The court sustained a motion to quash the original service, and after

---

[1] For a discussion of circumstances leading to, and surrounding the killing, see *Mode* v. *State*, 231 Ark. 477, 330 S. W. 2d 88, and *Mode* v. *State*, 234 Ark. 46, 350 S. W. 2d 675. Mode was convicted of 2nd degree murder in each case, and sentenced to 21 years in the penitentiary. The first case was reversed because of an erroneous instruction; this court affirmed the 2nd conviction.

numerous attempts, valid service was finally obtained on Mode on October 14, 1960. On the following November 1, Mode filed an answer himself, stating: "I deny every statement (sic) and every thing the plaintiff says and deny that they are entitled to anything from me and ask that the court dismiss their suit and deny them anything." The case was set for trial for January 3, 1962, and the clerk of the court notified appellant of this date by sending him a registered letter with return receipt requested. The return receipt was signed by Mode on December 16, 1961. On the date set for trial, appellant did not appear. Counsel for appellee requested that the court try the case without a jury. The request was granted and the court, sitting as a jury, proceeded to hear the testimony. After the conclusion of the evidence, judgment was entered against appellant in the total amount of $90,102.75, broken down as follows:

For disruption of the family ties, depriving the children of the parental care, affection, and instruction of their mother:

| | |
|---|---|
| 1. Jerry Russell | $2,000.00 |
| 2. Don Russell | 3,000.00 |
| 3. Ferrell Russell | 3,000.00 |
| 4. Darrell Russell | 3,000.00 |

For loss of their father's contribution and support:

| | |
|---|---|
| 1. Jerry Russell | $2,181.40 |
| 2. Don Russell | 3,116.28 |
| 3. Ferrell Russell | 4,051.16 |
| 4. Darrell Russell | 4,051.16 |

For the use and benefit of the children by reason of the loss of decedent's parental care, instruction, love and affection:

| | |
|---|---|
| 1. Jerry Russell | $2,500.00 |
| 2. Don Russell | 5,000.00 |
| 3. Ferrell Russell | 5,000.00 |
| 4. Darrell Russell | 5,000.00 |

For the use and benefit of the children as damages for their grief and mental anguish:

| | | |
|---|---|---:|
| 1. | Jerry Russell | None |
| 2. | Don Russell | $7,500.00 |
| 3. | Ferrell Russell | 7,500.00 |
| 4. | Darrell Russell | 7,500.00 |

Under Count II of the complaint, the court granted punitive damages in the sum of $25,000 for the use and benefit of the four children.[2] From the judgment so entered, appellant brings this appeal. For reversal, four points are relied upon, as follows:

## I.

Section 2 of Act 460 of 1949 (Ark. Stats. Ann. 27-1743.2) is unconstitutional in that it denies a defendant his right to a jury trial and the trial court therefore erred in failing to empanel a jury to hear the evidence and fix the damages, if any, in this case.

## II.

The trial court erred in granting appellee judgment on Point One of the complaint for the alleged "disruption of family ties" because minor children cannot recover for such alleged wrongs.

## III.

The court erred in allowing the plaintiff's request for admissions to be introduced in evidence.

## IV.

The damages awarded by the trial court are excessive.

We proceed to a discussion of each point in the order listed.

## I.

Ark. Stats. Ann. 27-1743.2 provides as follows:

"Hereafter, in all tort cases where the defendant answers in the time and manner provided by law, but

---

[2] The balance was an award of $702.75 for doctor, hospital, and funeral expenses incurred.

fails to appear and defend said cause in the time and manner provided by law, said failure to appear and defend in the time and manner provided by law shall constitute a waiver of the right of a trial by jury on the issue of damages.''

Appellant vigorously asserts that this statute is unconstitutional because (he contends) it denies a defendant his right to a jury trial, granted by Amendment No. 16 to the Constitution of Arkansas. Amendment No. 16, Article 2, § 7 Amended, reads as follows:

''The right of trial by jury shall remain inviolate, and shall extend to all cases at law, without regard to the amount in controversy; but a jury trial may be waived by the parties in all cases in the manner prescribed by law; *  *  *''

We do not agree with this contention. Obviously, those who drafted the constitutional amendment had the purpose and intention to invest in the Legislature the authority to determine what actions on the part of a litigant constituted a waiver of the right of trial by jury; we say ''obviously'' because there could have been no other purpose in the provision, ''but a jury trial may be waived by the parties in all cases in the manner prescribed by law.'' This provision, of course, includes prospective laws. The General Assembly is the lawmaking power, and it proceeded, in passing Act 460 of 1949 [of which 27-1743.2 is a part], to prescribe and enumerate various acts by which a defendant waives a trial by jury. While it is no part of our duty to pass upon the wisdom of legislation, we might comment that the statute appears entirely reasonable. A defendant is certainly aware that he has been sued, else he would not file an answer. In the instant litigation, Mode filed an answer himself, so it is readily apparent that he knew of the allegations in the complaint and the relief sought. Appellant states in his brief:

''It can be appreciated that there are circumstances in which a defendant finds himself unable to appear at a trial after having formally denied the plaintiff's alle-

gations. This could be due to ill health, lack of funds with which to secure the services of counsel[3] or any other of a multitude of reasons.''

Let it be pointed out, however, that there is no showing that any of the possible reasons cited, prevented the appearance of Mode at the trial. Section 29-506 Ark. Stats., 1962 Replacement, grants the trial court power to set aside a judgment ''for unavoidable casualty or misfortune preventing the party from appearing or defending.'' No motion was filed by appellant suggesting that relief should be granted under this section. Be that as it may, we find, and hold, § 27-1743.2 constitutional, and the court was accordingly within its rights in trying the case without a jury after appellee so requested.

## II.

The question of whether children can recover from one who disrupts family ties by enticing a parent away from the home, has been before courts of various states within the last several years. In *Whitcomb* v. *Huffington* (Kansas) 304 P. 2d 465, an opinion handed down on December 8, 1956, it is pointed out that three states (Illinois, Michigan and Minnesota) uphold the right to maintain such an action, and twelve jurisdictions (Arkansas, California, Colorado, Connecticut, District of Columbia, Massachusetts, New Jersey, New York, North Carolina, Ohio, Texas and Wisconsin) deny the right to maintain the action. Arkansas was undoubtedly included because of our holding in *Lucas* v. *Bishop,* 224 Ark. 353, 273 S. W. 2d 397. It is true, as pointed out by appellee, that the fact situation in *Lucas* was different from the case at bar. In the earlier case, Kenneth and Wilma Lucas were divorced at a time when their child, Nick Alvin, was three years of age. The divorce was awarded to Mr. Lucas, the decree finding that his wife had been guilty of abuse, contempt and studied neglect. Custody of the child was, by consent, awarded to the mother. Mrs. Lucas, in approximately two months, married Charles Bishop. Lucas subsequently, as next friend of his son,

---

[3] The record, relative to Mode's financial status, would hardly support the second possible reason listed by appellant.

instituted suit against Bishop for $50,000, alleging that the child had enjoyed a comfortable, happy home, but that Bishop had enticed the child's mother to such an extent that her domestic affections were alienated, and that Nick Alvin had been deprived of the parental care of his mother and father in their home, and the financial security he was afforded before the alienation of his mother's affections. Bishop demurred and the court sustained the demurrer, dismissing Lucas' complaint. On appeal, we affirmed. Of course, in that case, the child continued to live with its mother, whereas in the instant case, the mother left the children. We agree with appellee that the factual basis for recovery is much stronger in the case at bar than in *Lucas;* still we discern no legal difference. In *Lucas,* this court said:

"Unfortunately the wrong here emphasized is one that has not been legislatively translated into dollar compensation in this state; nor does the common law supply a plaintiff's answer. * * * Appellant calls attention to Art. 2, § 13, of the Arkansas constitution: 'Every person is entitled to a certain remedy in the law for all injuries and wrongs he may receive in his person, property, or character . . .' The argument is that unless relief is granted by this court it is apparent that appellant will be without a remedy and that he will be deprived of just rights without due process of law.

"But the difficulty is that in this state there is no statutory law to which recourse may be had, and the common law is not helpful, hence 'denial of due process' is rhetorical rather than substantive."

As heretofore pointed out, the weight of authority holds that minor children cannot recover for disruption of family ties, and some of the reasons (in addition to lack of statutory authority) are pointed out in cases from other jurisdictions. In *Henson* v. *Thomas,* 231 N. C. 173, 56 S. E. 2d 432, the Supreme Court of North Carolina said:

"To hold otherwise would mean that every time a person persuades a mother to engage in other activities

to such an extent as to cause her to neglect her children, he commits a tort for which he may be compelled to respond in damages. The only difference lies in the gravity of the wrong and the extent of the damage.

"The problem here, in its last analysis, is sociological rather than legal. No one would question the fact that a child has an interest in all the benefits of the family circle. Nor may it be denied that the legislative branch of the government may give this interest such legal sanction as would make the invasion or destruction thereof a legal wrong. So far, it has not deemed it wise to do so."

In *Whitcomb* v. *Huffington, supra,* the Supreme Court of Kansas stated:

"No one will deny the fact that under such circumstances a child is the innocent victim and, in most instances, suffers damage—emotional, financial, and otherwise. But, that is not the question. The question is whether, under such circumstances, the child is to be permitted to bring the action.

"If we were to answer the question in the affirmative the ramifications and far-reaching results of our decision would readily be apparent to anyone giving much thought to the matter. In practical effect we would be opening up a new field of litigation, heretofore entirely unknown, between minor children and their grandparents, for instance, or between minor children and business or social companions or acquaintances of their parents, when, perchance, some incident or line of conduct on the part of those persons occurs which might be said to have contributed to the eventual breakup of the family home and circle. We recognize fully that merely because the asserted cause of action was unknown to the common law and has no statutory sanction in this state, such fact does not present a conclusive reason for the denial of the existence of such right. Nevertheless, we are of the firm conviction that from the standpoint of sound public policy the creation of new rights of action in the field of alienation of affections is a question for

the consideration and determination of the legislature, and is a function which this court should not usurp.''

Contrary to some of the reasons advanced by those courts for not permitting such a cause of action, we, of course, recognize that from a moral standpoint, there is potent argument that a right of recovery should lie against one, who is so calloused in mind and heart, that he will take away the mother of four young boys. One would be hard pressed to find sympathy for the individual who commits such a deed, but, as was stated in *Lucas* v. *Bishop, supra,*

''The creation of a right of action for a child's benefit to compensate for loss of the intangible elements set out in the complaint here is a subject that addresses itself to the state's policy-forming department. Until the legislature has seen fit to designate the redress which, under Art. 2, § 13, of the constitution it has a right to do, the judiciary should not transgress the coordinate boundary established by Art. 4, § 1, of the constitution.''

We take occasion to reiterate this language. It follows that the court erred in rendering judgment against appellant under Count One of the complaint for $11,000, and that item is disallowed, set aside, and stricken from the judgment.

### III.

The Request for Admissions (which was not answered) was pertinent only to Point II, and since we have held there could be no recovery under that count, a discussion of Point III is unnecessary.

### IV.

It is contended that some of the awards were excessive. It is first asserted that the sum of $13,400 awarded for contributions and support is not justified by the evidence. Russell's income, at the time of his death, was $45.00 per week, which would amount to $2,340 per year. Jerry Russell was 14 years of age; Don Russell

was 11 years of age; the twins, Ferrell and Darrell, were 8 years of age. It is true that the record does not disclose just what amount the father contributed for the support of these children, but it is certain that he took care of them, *i.e.*, fed them, clothed them, and apparently provided them with whatever sums of money they used for recreation. Considering that the two youngest boys were 13 years away from attaining their majority, and Don and Jerry were respectively 10 and 7 years away from that period, we cannot agree that the total amount is excessive.

It is likewise asserted that the awards for decedent's parental care, instruction,[4] and love and affection, in the total amount of $17,500, are excessive. No contention is made in appellant's brief that this last was not a proper element of damage, but it might be mentioned that we find no wrongful death case from this state that uses the term ''love and affection''; in fact, in *Railway Co.* v. *Maddry*, 57 Ark. 306, 21 S. W. 472, this court held that the happiness found by the child in the love and companionship of the decedent father should never be considered. Subsequently, however, in several cases, we used language which indicated this to be a proper award. For instance, in *St. Louis & N. A. Rd. Co.* v. *Mathis*, 76 Ark. 184, 91 S. W. 763, it was said:

''So, in a case of this kind no amount of money can fully compensate children for the distress of mind suffered by them in the violent and painful death of the father, and in *the loss of his affectionate care*[5] and attention, but the court must ascertain some just amount to allow a fair compensation for the injury.''

In *Kansas City So. Ry. Co.* v. *Henrie*, 87 Ark. 443, 112 S. W. 967, this court, referring to a decedent father, and discussing elements of damage, stated:

---

[4] We have held that "the loss to minor children of the instruction, physical, moral and intellectual training by a parent is a proper element to be considered in estimating the damage to the children by reason of such parent's wrongful death." *St. Louis, I.M. & S. Ry. Co.* v. *Prince*, 101 Ark. 315, 142 S. W. 499, and cases cited therein.

[5] Emphasis supplied.

"He was * * * kind and affectionate toward his wife and children and greatly interested in the proper education and training of his children. * * *"

Other cases use language in a similar vein. It would, therefore, appear that the terms used in the cases cited, and others of similar import, are, to a degree, synonymous with the term "love and affection." Appellant states there is no evidence in the record that Russell did other than take his sons fishing and swimming; also, occasional visits to the old homeplace in order for the boys to see their friends. It is also contended that the award for "grief and mental anguish," in the amount of $22,500, is not sustained by the evidence.[6]

We are not familiar with any rule by which the explicit pecuniary value of parental care, instruction, and affection, can be determined, but the children were definitely entitled to such an award. It would certainly appear from the record that these benefits to the children were mainly furnished by the decedent, for the mother voluntarily left her home—and these children. According to the record, the children had seen their mother but few times after she left the home; in fact, two of the boys testified that they had not seen her at all subsequent to their father's funeral.

In *Peugh* v. *Oliger*, Law Reporter of March 20, 1961, 345 S. W. 2d 610, we pointed out that the term "Mental anguish" means more than normal grief, quoting from an earlier opinion of this court as follows:

"It will thus be seen that the mental anguish for which a recovery can be had must not consist simply of annoyance or disappointment or a suffering of the mind growing out of some imaginary situation, but it must be some actual distress of mind flowing 'from the real ills, sorrows, and briefs of life'."

In *Strahan* v. *Webb*, 231 Ark. 426, 330 S. W. 2d 291, in discussing mental anguish, we said:

---

[6] No award for mental anguish was made for the oldest boy, Jerry, who did not testify in the case.

"Who can say how much mental anguish is worth * * * Unquestionably, the anguish and total loss of companionship will be felt far more in some cases than in others. There are individuals who really never completely reconcile themselves to the loss of a loved one, while, on the other hand, there are those who adjust themselves within a reasonable period of time, and are pretty well able to continue along in the usual pattern." In the instant case, we have three small boys who had been in close association with their father, probably a closer relationship than in the average family, due to the fact that there was no mother present to share in the companionship. Suddenly the one remaining parent was taken away from them—and in a violent manner. According to the evidence of Cecil Barnett, husband of Mrs. Clida Barnett, the boys' grandmother, the younger boys cried many nights, and on several occasions awakened the Barnetts in the middle of the night, "There's been a many of nights that me and my wife would go to bed, pick them up and take them in and love them and talk to them." The witness stated that Ferrell, one of the twins, had been under a doctor's care due to extreme nervousness. The boys testified that their father was good to them, and would take them fishing, swimming, and to the picture show. Mrs. Barnett stated, "He took the boys everywhere he went when he wasn't working, and they were not in school. If he went anywhere, they were with him, because he didn't leave them behind. And he worshiped those boys." She also testified that their father's death affected their school work: "They were able to continue in school but they had to stay in that same grade that year. They had to stay in that grade two years."

As stated, there is no way to measure mental anguish. Who can determine the grief of a small boy over the sudden death of his father—a father with whom he had been closely associated—and who had been the lone source of parental advice and encouragement? The adult child who loses a parent is generally better able to withstand the blow than a minor child whose close and con-

stant association with the parent in the home creates considerably more of a binding tie. It need not be added that the manner of the death of a loved one contributes to mental anguish, and the facts of Russell's death were well known by the children.

The $25,000 award for punitive damages is not specifically attacked, but, even so, the record supports the award made.[7]

We are unable to say that any of the awards were excessive.

In accordance with the views heretofore expressed, the judgment is modified by reversing the award in the total amount of $11,000 made under Count I (for disruption of the family ties and depriving the children of the parental care, instruction and affection of their mother). So modified, the judgment, in a total amount of $79,102.75, is affirmed.

---

[7] For instance, Wendell Bryant, Circuit Clerk and Recorder of Faulkner County, testified to several transactions reflected in his records, wherein Mode was paid sums of money totaling $125,000.