No. 46,381

WARREN DEAN LONG, *Appellee*, v. EDWARD F. FISCHER, *Appellant*.

(499 P. 2d 1063)

Opinion filed July 19, 1972.

*Don W. Noah*, of Noah and Noah, of Beloit, argued the cause and was on the brief for the appellant.

*Daniel D. Metz*, of Metz and Metz, of Lincoln, argued the cause, and *Theodore M. Metz*, of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: The plaintiff, Warren Dean Long, was awarded a jury verdict of $8,500 as balm for the alienation of the affections of his wayward spouse, Madonna. The defendant, Edward F. Fischer, who allegedly procured the alienation of affections, appeals.

Although nine points of error are raised on appeal, we believe that this case may be disposed of by considering the sufficiency of the evidence. The evidence was insufficient and defendant's motion for a directed verdict should have been sustained.

We will refer to the parties in this so-called "eternal triangle" as Long, Madonna and Fischer.

Long married Madonna when she was seventeen years of age. Long was twenty-four. Following the marriage they lived on a farm near Cawker City, Kansas. Their life on the farm was happy but filled with hard work and little income. Later they moved to town and Long obtained employment with a farm implement company. They became the parents of two children and acquired a home on South Fifth Street in Lincoln, Kansas. Their marital

relationship appears to have been normal until July, 1968. Long then noticed Madonna was becoming alienated from him.

Fischer, his wife and four children moved next door to the Longs in May, 1967. Long helped Fischer carry some of the household furnishings into the house. The two neighboring families thereafter enjoyed a close social fellowship. The children played together. The Longs attended parties in the basement of the Fischer home. The Longs sometimes helped prepare for the parties and clean up afterwards. They visited back and forth.

Long testified that Madonna began sleeping on the divan in September, 1968. Thereafter she refused to occupy the same bedroom with Long. Evidence of the procuring cause of the alienation prior to that time does not appear in the record of the trial. Long testified that Madonna complained of illness in July, 1968, and began seeing a doctor in Salina. She made the trips to Salina alone and on occasion she stayed overnight with relatives. In July, 1968, the Long children attended the county fair at Osborne where their grandparents lived. The Longs arranged for Madonna to pick up the children at Osborne and return home with them after the fair was over. Somehow when she made the trip she did not arrive at the grandparents' home until 1:30 a. m. the next morning. Long and some of the relatives searched unsuccessfully for her. No information on whom she saw or what she did was placed in evidence. From these episodes, plus a later statement of Madonna during a family argument, we must, if possible, supply a procuring cause for the initial alienation.

Long testified that during a quarrel some six months later, Madonna stated, "I had guessed right, everything I had suspicions of her doing I had guessed right." Presumably she had referred to prior transgressions with Fischer in Salina and Osborne or to more recent ones in Lincoln.

As to that period prior to September, 1968, when Madonna refused to sleep with her husband, there is no evidence of any acts on the part of Fischer which could have alienated the affections of Madonna. Surmise, conjecture, speculation and plausibility will not supply a want of proof that defendant knowingly and intentionally alienated the affections of the wayward spouse. Guilt will not be inferred from opportunity. (*Powers v. Sumbler*, 83 Kan. 1, 110 Pac. 97; *Ogg v. Ogg*, 124 Kan. 443, Pac. 647.)

In the fall of 1968, Long, Madonna, Fischer and Fischer's wife,

Rosemary, attended several public V. F. W. dances together. Long testified that "From July, 1968, on, . . . my wife and I argued every time we got on the dance floor but before that, no." At these dances Fischer was attentive to Madonna. There is no evidence Madonna resisted his attentions or that Fischer forced himself on her. When Long threatened not to attend the dances Madonna advised him if he did not take her she would go with the Fischers. Long took Madonna to these dances because of her coercive threats to go with the Fischers. Fischer monopolized Madonna at these dances.

Long testified to finding his wife in a tent in the Fischer backyard sometime during the fall of 1968. About midnight he awoke and looked for Madonna on her divan. She was not there. After making a search of the premises he spotted a tent in the Fischer backyard. Upon further investigation he found Madonna in the tent in her night clothes with a housecoat and a blanket. Fischer was nowhere to be seen. Long jerked his wayward Madonna out of the tent and when they were back on his property he "slapped her a couple of times and accused her of meeting Fischer and she denied it."

The next chapter of this sordid affair took place when the two couples attended the New Year's Eve dance on December 31, 1968. Long did not want to attend this dance at Kanopolis. Madonna had planned to attend for sometime. Long finally agreed to go when Madonna threatened to go with the Fischers. The two couples started out with a few drinks at the Fischer house, then they drove to Kanopolis. Rosemary Fischer was not feeling well. Long and his wife, Madonna, danced the first dance together. Thereafter Fischer danced with Madonna and Long retired, with his bottle, to the car where he spent the evening. No one came to look for him. On returning to the dance hall at midnight a quarrel ensued. Madonna's blouse was torn by Long and Fischer got a New Year's Eve kiss from Madonna. Long got no kiss from his wife. Madonna drove the car home with Long sitting silently beside her in the front seat. The two couples returned early that morning to the Fischer home to obtain something to eat. Madonna decided to spend what was left of New Year's day at the Fischers'. Long implored Madonna to return home with him. She refused. A man of the cloth was called in to persuade her to leave, and later her parents, but all to no avail. On the morning of January

2, 1969, Madonna was persuaded to return to her house by Fischer.

The next chapter might be referred to as the washing machine episode. The Longs' washing machine broke down and Madonna was offered and did accept the use of the Fischer washing machine. She spent considerable time at the Fischers' doing her washing, drinking coffee and so forth. On January 11 or 12, 1969, Long woke up at 5:30 a. m. and saw his Madonna coming out of the back door of the Fischer house. When Madonna arrived home no argument ensued because Long did not want to wake up the children at that hour of the morning. The Fischer house was not lighted, the hour of Madonna's visit was unusual and the purpose of the trip was not truly explained.

Madonna began working in a retail liquor store in January, 1969. Fischer was seen in the store on several occasions for periods of roughly an hour or so. Fischer was advised by the owner that his loitering was against the rules, so he quit visiting the store. Six weeks later Madonna quit work.

On several occasions during January, 1969, Long discovered Fischer visiting Madonna in the daytime at the Long house. On January 14, one of the children called Long while at work to advise him that Madonna was over at the Fischers'. Long came home to argue with Madonna about the visit. Madonna threatened Long with a divorce proceeding. Long packed up and moved out of the house. On February 10, 1969, Long filed for divorce. Madonna refused his efforts at reconciliation and in May the divorce was granted. Eight days later this action was filed.

Much has been written in the case law of this state concerning the nature of the evidence necessary to support an action for alienation of affections. The difficulties of proof to support such an action have grown with the growth of case law.

In *Powers v. Sumbler,* supra, it was said for a plaintiff to recover it must be shown the efforts of the defendant were the controlling cause that destroyed the affection and caused the separation. It must be shown that the acts of the defendant were done knowingly and intentionally for the purpose of alienating the affections of the wayward spouse.

In *Burch v. Goodson,* 85 Kan. 86, 116 Pac. 216, it was said that the means of alienation must be "continued willful machinations", and there must be proof that defendant exerted a deliberate effort directed to the specific end, alienation.

In *Roberts v. Dockstader,* 144 Kan. 384, 61 P. 2d 114, it was said:

"Actions for damages for alienation of affection and for breach of promise of marriage have become so obnoxious to the public welfare that the legislatures of some states have abolished them. The remedy for alienation still exists in this state, but only subject to the limitations stated in the case of *Powers v. Sumbler,* 83 Kan. 1, 110 Pac. 97. The acts of the defendant must be done knowingly and intentionally, for the purpose of alienating the husband's [wife's] affection, and must be the controlling cause of alienation." (p. 402.)

In *Curry v. Kline,* 187 Kan. 109, 353 P. 2d 508, the burden on the plaintiff was further explained. The plaintiff must prove the wayward spouse did not voluntarily bestow his or her affections on the defendant and that he or she did not voluntarily join with the defendant in creating the so-called "eternal triangle". If he or she did voluntarily join in the affair then the defendant was not the procuring cause of the alienation.

In *Curry v. Kline,* supra, it was said:

"To enable a plaintiff to maintain an action of this nature it is necessary he allege and prove that the defendant was the active, controlling cause of the loss of the wife's love and affection and that the defendant exercised an improper, willful and malicious influence in derogation of the plaintiff's marital rights. . . . The purpose for the rule is to stop the attempt by some to use the courts as a means to exact payment when the defendant's acts were not the real or controlling cause of the alienation. Regardless of what has heretofore been said and held concerning this type of action, the hard, practical realities of everyday life dictate that where a plaintiff has been the controlling cause of the alienation, or where the wife voluntarily joins with the stranger in creating the so-called 'eternal triangle' by bestowing her love and affection upon him, a plaintiff may not shout in a petition that the stranger has alienated the affection of his wife and recover damages from him. Hence, to state a cause of action it is essential that a plaintiff allege and prove he was not at fault in causing the wife's affections to stray, and that she did not voluntarily bestow her love and affection upon the stranger." (p. 111.)

Our most recent case of *Wilson v. Aylward,* 207 Kan. 254, 484 P. 2d 1003, reaffirmed the above case law of this state and overturned the $50,000 judgment which was in favor of the husband of a wayward spouse.

After studying the foregoing cases it becomes apparent that proof of the following issues of fact, among others, must be found in the evidence to support a judgment for alienation of affections.

(1) The defendant must have exercised improper, willful and malicious influence on the wayward spouse in derogation of the plaintiff's marital rights.

(2) The wayward spouse must *not* have voluntarily accepted defendant's advances at the outset of the affair.

(3) The wayward spouse must *not* have actively contributed to the procuration by intentionally seeking the companionship and the affection of the defendant.

(4) The plaintiff must prove he or she was not at fault in causing the other spouse's affections to stray.

(5) The willful and malicious influence of the defendant on the wayward spouse must be proven as the procuring cause of the loss of the love and affection which the wayward spouse formerly held for the plaintiff.

The evidence in the present case is wholly lacking in proof that it was the willful and malicious influence of the defendant that procured the loss of love and affection. There is no showing of any resistance on the part of Madonna to Fischer's companionship or his attentive advances. There is no evidence that Madonna discouraged his advances. On the other hand it is apparent that Madonna initiated the companionship and was active in intentionally bringing about the alienation. She drove to Salina alone for weekends. She drove to the Osborne fair and became lost. She insisted on attending dances with the Fischers. She used their washing machine at odd hours of the morning. She moved out of her husband's bedroom early in the period of alienation. She slipped away from her divan and went to the Fischers' backyard to sleep in a tent. She refused to return home on New Year's day and Fischer alone was able to persuade her to return home on the following day. When her employer objected to Fischer loitering at her place of employment Madonna quit work.

Clearly Madonna voluntarily accepted defendant's companionship and advances at the outset. She continued actively and intentionally to seek the defendant's companionship and advances. There was a complete lack of proof that defendant by willful and malicious acts caused Madonna to lose her love and affection for plaintiff. There can be but one conclusion from the evidence in the case. Madonna acted intentionally from the outset and she was an active contributing cause in this sordid affair. She acted willfully and voluntarily in completing the eternal triangle.

In view of what has been said it becomes the duty of this court

to make a final disposition of the case. Other matters raised on appeal require no discussion.

The judgment is reversed with directions to enter judgment for defendant.