JOAN H. HUNT, Individually and as next friend of JAMES RICHARD HUNT II, a minor, Plaintiffs-Appellants, *v.* ELAINE CHANG, aka ELAINE PEPITONE, Defendant-Appellee

NO. 6197

APRIL 19, 1979

RICHARDSON, C.J., OGATA AND MENOR, JJ.
AND RETIRED JUSTICE KOBAYASHI
ASSIGNED BY REASON OF VACANCY*

---

* Justice Kidwell, who heard oral argument in this case, retired from the court on February 28, 1979. HRS § 602-11 (1978 Supp.) provides: "After oral argument of a case, if a vacancy arises or if for any other reason a justice is unable to continue on the case, the case may be decided or disposed of upon the concurrence of any three members of the court without filling the vacancy or the place of such justice."

OPINION OF THE COURT BY KOBAYASHI, J.

This is an appeal from orders of the circuit court of the first circuit, granting Elaine Chang defendant-appellee's (appellee) motion for summary judgment against plaintiff-appellant Joan H. Hunt (appellant) and dismissing appellant's action as next friend of James Richard Hunt II, a minor. We affirm.

### ISSUES

I. Whether the trial court erred in granting appellee's motion for summary judgment against appellant.

II. Whether the trial court erred in granting appellee's motion to dismiss the action as to appellant, as next friend of James Richard Hunt II, a minor.

### STATEMENT OF THE CASE

The appellant, individually and as next friend of James Richard Hunt II, a minor, filed a complaint, alleging alienation of affection, deprivation of affection and support, and damages suffered, in circuit court against appellee (also known as Elaine Pepitone).

Appellee filed a motion for summary judgment and/or dismissal and a memorandum in support of the motion. Appellee's memorandum states:

> There are undisputed facts . . . which preclude plaintiffs' claim as a matter of law and entitle defendant to summary judgment.
>
> .   .   .   .
>
> [T]he complaint fails to state a claim on behalf of plaintiff James Richard Hunt II.

An affidavit of James R. Hunt was filed.

The appellant filed an affidavit of counsel in opposition to motion for summary judgment.

Depositions of all of the parties were filed.

After a hearing, the trial court granted appellee's motions.

## STATEMENT OF FACTS

James R. Hunt is the husband of the appellant. After James Hunt's first wife left him, James Hunt and appellant "moved in together." James Hunt and his first wife were divorced in June, 1964. Thereafter, the appellant and James Hunt were married in June, 1964. Their son, Jimmy, was born on June 30, 1964, 29 days after their marriage.

James Hunt has had eleven jobs in eleven years.[1] He has generally been employed as a restaurant manager.

Evidence adduced showed that James Hunt was unable to serve for any length of time in any of his employments. The appellant and son, Jimmy, traveled with and/or followed James Hunt to his various new employments in several different states.

In 1971 appellant filed a divorce complaint against James Hunt in Newport Beach, California, "because of his alcoholic and gambling." The appellant stated that James Hunt promised her that if she would "drop the divorce action he would stop drinking and gambling." Appellant stated, "He stopped gambling, and he temporarily at least stopped drinking."

In August or September, 1974, James Hunt came to Honolulu to work as general manager of the Oceania Floating Restaurant. Appellant and Jimmy remained in Phoenix. James Hunt told appellant he would send for them "as soon as conditions warranted."

The appellee has been married to Dean Pepitone since September 12, 1972. Dean Pepitone left appellee when James Hunt "came into the picture."

---

[1] Appellant stated that James Hunt "had an alcoholic problem" and that this was "the major factor in him switching jobs."

James Hunt first met appellee in October, 1974. They were introduced at the Oceania Restaurant, located in Honolulu, by mutual friends. The appellee stated that when she met James Hunt she knew he was married. James Hunt stated as follows:

Q. [W]hen did you start seeing her on a boy-girl relationship?

A. When did I — Well, the day that I met her, or the evening that I met her.

Dean Pepitone stated that appellee would go to see James Hunt "every night."

In March, 1975, James Hunt moved in with appellee. By then Dean Pepitone had already moved out. At the time of the hearing James Hunt was still living with appellee. Appellee stated:

I would say he asked to live in my house on account of his financial hardship and I just don't have the heart to refuse; and in the meantime, I enjoy his company.

The appellee supported James Hunt while he was living with her. The appellee stated that she was in the "apartment rental, income rental business, and real estate." She further stated that a trust holds title to the apartments and real estate.

James Hunt made three or four trips abroad with appellee. In May or June, 1975, James Hunt joined appellee in Las Vegas. The appellee paid for the tickets and gave James Hunt money to use at the tables. James Hunt stated:

No, it was not prearranged in that sense that we arranged it here in Hawaii.

. . . .

Mrs. Chang was on the mainland at the time, and on a telephone conversation, she had some time that she was going to Las Vegas, and I asked, "Well, I'd sure like to come over and join you there for a few days."

On about June 6, 1975, James Hunt was terminated from his job at the Oceania Restaurant.

On June 6, 1975, appellee and James Hunt left on a trip to Europe. The trip was paid for by appellee. They returned to Honolulu approximately July 16, 1975.

The appellant stated that from August, 1974, when James Hunt left Phoenix, until June, 1975, he wrote her twice a week and called her every Sunday night. James Hunt stated that he wrote appellant "two, three times a month, on the average."

James Hunt wrote letters to his wife while he was on the trip to Europe. He stated that he mailed appellant a letter, dated June 16, 1975, from Bucharest, Rumania, telling her not to come to Honolulu and that "things were through" between them.

The appellant stated that it was when she received a letter from James Hunt from Rome,[2] dated June 16, 1975, that she first suspected that he did not want her to come and join him in Hawaii. Appellant stated as follows:

Q. So the letter from Rome was the very first time that you became aware, or became suspicious that Jim was with another person?

A. That is correct. Well, let me qualify it by saying that I knew that my husband did not have the funds to go to Europe, where I just received a letter from him.

Q. In other words, you figured it out on your own that —

A. To that extent, yes.

Q. Did you also become suspicious that there was another woman involved at that time?

A. Yes, rather, uh-huh, because of, again, the financial situation.

Q. Any other reason why you thought another woman was involved?

A. No, except that I had discovered just prior to that time, by a day or two, that Mr. Hunt had been terminated from the Oceania Restaurant. I had several people call to tell me that.

The appellant stated that after she received "the letter from Rome," she phoned Mrs. Francis Siu, a friend.

Q. When and where and from whom did you first become aware of the name Elaine Chang?

---

[2] James Hunt stated that he never was in Rome.

A. From a Mrs. Francis Siu.

. . . .

A. She just told me that they [appellee and James Hunt] were very friendly, and she did not know for sure, but she was quite sure that Jim had gone on a trip around the world with her.

The appellant stated that "other than the facts which [allegedly] give rise to this complaint," she was sure that James Hunt never had an affair with another woman.

On July 18, 1975, after James Hunt had returned from Europe, appellant called him at the home of appellee. James Hunt asked appellant not to come to Honolulu and said that things would work out better for everyone concerned if she and Jimmy stayed in Arizona. Appellant stated:

Then she [appellee] broke in, on the extension I presume. At first she said that Mr. Hunt was a boarder there. Then she changed it. I asked her to please get off the line, that I was speaking to my husband. And she said, "I am supporting him and you are using my telephone and I don't want you to call this house now or ever again."

The appellant stated that James Hunt then broke in and said he would call appellant back from another number in twenty minutes. James Hunt called appellant back the next morning.

James Hunt stated that he had been sending appellant "a thousand dollars a month, on the average" for support. The appellant stated that she had not received any support money from James Hunt since "the middle of July."

James Hunt made the following statements regarding his marriage to appellant:

Q. Now, would it be fair to say that you and Joan were in love when you first got married?

A. Yes.

Q. Was it at least initially a good marriage?

A. We were very happy with the boy.

. . . .

Q. Would it be fair to say that up until this time [October or November, 1969] you had a good marriage, sir?

A. I would say we did up to the time we left Hawaii, up to the time we —

Q. Well, I just don't want to get confused on the dates. You had a good marriage —

A. Until about 1969.

Q. You had a good marriage until 1969. You had a bad marriage after 1969?

A. It was a little strenuous where we cannot make ends meet. My income was insufficient for living.

Q. But you two were getting along tolerably well, weren't you?

A. As well as could be.

.    .    .    .

Q. . . . How would you characterize your marriage at this time?

A. It was getting along.

.    .    .    .

Q. Now Mr. Hunt, when you left — was it Phoenix to accept work in Honolulu at the Oceania — would it be fair to say that your marriage relationship with your wife, Joan, was a good one at that time?

A. Well, we were just getting along. I wouldn't call it good.

.    .    .    .

Q. Would it be fair to say, Mr. Hunt, at the time you left your wife and child to accept employment in Honolulu in 1974, you had no intention at that time of divorcing her?

A. Well, the thought of a divorce has been in my mind for some time, for some years, except the thought of hurting the son as would hold my action on it.

.    .    .    .

Q. Would you say you were not in love with your wife when you left her in Phoenix for the job in Honolulu?

A. That's true.

Q. Did you ever tell her you were not in love with her?

A. No.

Q. That was something you knew?

A. That's right.

The appellant stated as follows regarding the marriage:

Q. What was the state of your marital relationship, in your own words, when Jim left to come to Honolulu in August 1974?

A. Our marital relationship was the same as it had always been. Jim and I were very much in love. Had been for years.

As to his relationship with his son, Jimmy, James Hunt stated:

Q. I'm told that you've always had a pretty good relationship with your son; is that correct?

A. Yes, sir.

Q. Him to you and you to him?

A. Yes.

The appellee stated as follows:

Q. Did you observe that Jim and his son got along very well?

A. I think so.

Q. Have a good relationship, father and son?

A. Just like every parents love their children.

Appellee stated as follows regarding her relationship with James Hunt:

Q. Did you ever encourage Jim to leave his wife Joan?

A. No, sir.

Q. Did you tell Jim to go back to his wife?

A. I guess I did for a few occasions.

Q. But not lately?

A. Yes, even last night.

Q. Even last night.

A. Yes.

James Hunt's affidavit states as follows:

. . . . .

3. Immediately following Affiant's introduction to defendant Affiant sought and pursued defendant's affections and companionship.

4. Affiant succeeded in his efforts to acquire defendant's affections and companionship and presently resides with defendant at defendant's premises.

OPINION

I. WHETHER THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT AGAINST APPELLANT.

ACTION FOR ALIENATION OF AFFECTIONS:

The action for alienation of affections has not been abolished by statute in this jurisdiction.[3]

The only reported case in this jurisdiction concerning interference with the marital relationship is *Waki v. Yamada*, 26 Haw. 52 (1921). In *Waki v. Yamada*, this court upheld the dismissal of an action for enticement. At common law, enticement and alienation of affections were treated as separate causes of action.[4] Prosser, Handbook of the Law of Torts 874-77 (4th ed. 1971); Note, The Case for Retention of Causes of Action for Intentional Interference With the Marital Relationship, 48 Notre Dame Lawyer, 426, 427-28 (1972).

The appellee refers this court to a recent Kansas decision, *Long v. Fischer*, 210 Kan. 21, 499 P.2d 1063 (1972), which sets forth the elements of an action for alienation of affections as follows:

(1) The defendant must have exercised improper, willful, and malicious influence on [plaintiff's] spouse in derogation of the plaintiff's marital rights.

(2) The [plaintiff's] spouse must not have voluntarily accepted defendant's advances at the outset of the affair.

---

[3] The action for alienation of affections has been abolished by statute in about one third of the states. Wyman v. Wallace, 15 Wash. App. 395, 396 n. 2, 549 P.2d 71, 72 n. 2 (1976); Notes & Comments, Torts: Alienation of Affections: A Child's Right to Seek Damages for Alienation of His Parent's Affection, 28 Okla. L. Rev. 198, 202 n. 25 (1975). In addition, the action has been abolished by judicial decision in one state, Wyman v. Wallace, 15 Wash. App. 395, 549 P.2d 71 (1976), and refused judicial recognition in another state, Moulin v. Monteleone, 165 La. 169, 115 So. 447 (1927). *See* Bearbower v. Merry, 266 N.W.2d 128, 132 (Iowa 1978).

[4] Recently, some courts have considered enticement and alienation of affections to be merely different forms of the tort of interference with the marital relationship. Skaggs v. Stanton, 532 S.W.2d 442, 443 (Ky. 1975); Prosser, Handbook of the Law of Torts, *supra* at 876-77.

(3) The [plaintiff's] spouse must not have actively contributed to the procuration by intentionally seeking the companionship and the affection of the defendant.

(4) The plaintiff must prove he or she was not at fault in causing the other spouse's affections to stray.

(5) The willful and malicious influence of the defendant on the [plaintiff's] spouse must be proven as the procuring cause of the loss of the love and affection which the [plaintiff's] spouse formerly held for the plaintiff. (Emphasis omitted.)

*Id.*, 210 Kan. at 25-26, 499 P.2d at 1067.

Appellee also relies on an earlier Kansas case, *Curry v. Kline*, 187 Kan. 109, 353 P.2d 508 (1960), which states:

To enable plaintiff to maintain an action [for alienation of affections] it is necessary that [plaintiff] allege and prove that the defendant was the active, controlling cause of the loss of [plaintiff's spouse's] love and affection and that the defendant exercised an improper, willful, and malicious influence in derogation of the plaintiff's marital rights. . . . Hence, to state a cause of action it is essential that a plaintiff allege and prove [that plaintiff] was not at fault in causing [his or her spouse's] affections to stray, and that [plaintiff's spouse] did not voluntarily bestow [his or] her love and affection upon the stranger.

*Id.*, 187 Kan. at 111-12, 353 P.2d at 510.

The appellant in oral argument urged this court to accept the *Curry* test. The appellee in oral argument argued in favor of the *Long* test.

In both *Long* and *Curry*, the Kansas Supreme Court reviewed previous alienation of affections cases in that jurisdiction. In *Long*, the court, in formulating the elements of the action, took the *Curry* test into consideration. 210 Kan. at 25, 499 P.2d at 1066-67.

A careful comparison of the respective elements of the *Long* and *Curry* tests indicates little difference in substance. The only difference is that the *Curry* test's element, "Plaintiff's spouse did not voluntarily bestow his or her love and affection upon the stranger," was changed in *Long* into two, more specific elements:

(2) The plaintiff's spouse must not have voluntarily accepted defendant's advances at the outset of the affair.

(3) The plaintiff's spouse must not have actively contributed to the procuration by intentionally seeking the companionship and the affection of the defendant.

We adopt the more definitive standard enunciated in *Long,* as the criteria of proof required in an action for alienation of affection.

A. GENUINE ISSUE AS TO ANY MATERIAL FACT:

Appellant contends (1) that the decision of the trial court was clearly erroneous "in light of triable issues of fact revealed by the pleadings and oral argument"; (2) that appellee failed to meet the burden of removing all doubt as to the existence of triable issues of fact; and (3) that appellant "has sufficiently countered [appellee's] evidence to avoid a ruling against her."

Under H.R.C.P. Rule 56(c) a summary judgment is sustained only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Bolte v. AITS, Inc.,* 60 Haw. 58, 64, 587 P.2d 810, 814-15 (1978); *Fry v. Bennett,* 59 Haw. 279, 280, 580 P.2d 844, 846 (1978). Inferences to be drawn from the record must be viewed in the light most favorable to the nonmoving party. *Hokama v. Relinc Corp.,* 57 Haw. 470, 472, 559 P.2d 279, 281 (1977); *Island-Gentry Joint Venture v. State,* 57 Haw. 259, 266, 554 P.2d 761, 766 (1976).

For purposes of ruling on a summary judgment a fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. *Timmons v. Reed,* 569 P.2d 112, 117 (Wyo. 1977); *Johnson v. Soulis,* 542 P.2d 867, 871-72 (Wyo. 1975). *See Richards v. Midkiff,* 48 Haw. 32, 39, 396 P.2d 49, 54 (1964). In *Johnson v. Soulis, supra,* the court explained:

[A material] fact would necessarily affect the application of the appropriate principle of law to the rights and obligations of the parties. In considering a motion for summary

judgment it is appropriate for a court to identify the essential elements of the plaintiff's cause or of the defense asserted, and to then determine the materiality of any fact in the light of whether it will establish or refute one of those essential elements. If it does not have that effect, it would not be a material fact in the controversy, and a genuine issue with respect to that fact, no matter how sharp, would not foreclose the granting of a motion for summary judgment.

*Id.* at 872.

Upon review of the record, including the affidavits, depositions, and testimonies of the parties and others, we are of the opinion a genuine dispute does not exist as to any material fact.

### B. JUDGMENT AS A MATTER OF LAW:

Based on the undisputed material facts of the instant case, we are of the further opinion that appellant has failed to establish all of the five elements of the test enumerated in *Long v. Fischer, supra.*

The record shows clearly that appellant satisfied two of the five elements of the test:

1. that, the appellee has "exercised improper, willful, and malicious influence on [appellant's] spouse in derogation of [appellant's] marital rights"; and

2. that, appellant "was not at fault in causing [her] spouse's affections to stray".

However, the appellant has failed to satisfy the other requirements of the *Long* test.

The facts show:

1. that, the appellant's spouse "voluntarily accepted appellee's advances at the outset of the affair"; and,

2. that, the appellant's spouse did actively contribute to appellee's effort of procuring the "loss of the love and affection which [appellant's] spouse formerly held for the [appellant] by intentionally seeking the companionship and the affection of" the appellee.

3. The appellant further failed to prove that "the will-

ful and malicious influence of the appellee" on appellant's spouse was "the procuring cause of the loss of the love and affection" which the appellant's spouse formerly held for the appellant.

We, therefore, agree with the trial court that appellee was entitled to summary judgment as a matter of law.

II. WHETHER THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION TO DISMISS THE ACTION AS TO APPELLANT, AS NEXT FRIEND OF JAMES RICHARD HUNT II, A MINOR.

The issue herein is whether in this jurisdiction a minor child has a cause of action for alienation of affections.

In this jurisdiction such a cause of action is recognized by neither statute nor case law.

Appellee contends:

There is absolutely no basis under common law or by statute for a suit by a son against a third person for an alleged alienation of his father's affections. As a result, the overwhelming weight of authorities have denied such a cause of action in the child.

Appellant argues that at common law a minor child does have a cause of action for alienation of affections. Appellant relies upon *Daily v. Parker*, 152 F.2d 174 (7th Cir. 1945); *Johnson v. Luhman*, 330 Ill. App. 598, 71 N.E.2d 810 (1947); *Miller v. Monsen*, 228 Minn. 400, 37 N.W.2d 543 (1949); and *Russick v. Hicks*, 85 F.Supp. 281 (W.D. Mich. 1949).

The great majority of jurisdictions which have dealt with this issue have held that a minor child does not have a cause of action for alienation of affections. *Mode v. Barnett*, 235 Ark. 641, 649, 361 S.W.2d 525, 529 (1962); *Rudley v. Tobias*, 84 Cal. App. 2d 454, 457, 190 P.2d 984, 987 (1948); *Taylor v. Keefe*, 134 Conn. 156, 161-62, 56 A.2d 768, 770 (1947); *Whitcomb v. Huffington*, 180 Kan. 340, 344, 304 P.2d 465, 467-68 (1956); *Nelson v. Richwagen*, 326 Mass. 485, 488, 95 N.E.2d 545, 546 (1950); *Miller v. Kretschmer*, 374 Mich. 459, 461, 132 N.W.2d 141, 143 (1965); *Kleinow v. Ameika*, 19 N.J. Super. 165, 167-68, 88 A.2d 31, 33 (1952); *Roth v. Parsons*, 16 N.C. App. 646, 647, 192 S.E.2d 659 (1973); *Katz v. Katz*, 197 Misc. 412, 413, 95 N.Y.S.2d 863, 864 (1950); *Kane v. Quigley*, 1

Ohio St.2d 1, 3, 203 N.E.2d 338, 340 (1964); *Nash v. Baker,* 522 P.2d 1335, 1339-40 (Okl. Ct. App. 1974); *Garza v. Garza,* 209 S.W.2d 1012, 1016 (Tex. Civ. App. 1948); *Wallace v. Wallace,* 155 W.Va. 569, 579, 184 S.E.2d 327, 332-33 (1971); *Scholberg v. Itnyre,* 264 Wis. 211, 215, 58 N.W.2d 698, 700 (1953).

The four cases relied upon by appellant are apparently the only reported cases which hold that a minor child has a cause of action for alienation of affection. These minority cases focus on the importance of the family unit. The basis for their position is summarized as follows in Rieff, Relational Interests: A Minor Child's Action Against a Third Party Who Alienates the Affections of a Parent, 7 J.Fam.L. 14, 15 (1967):

> The basis for an action of this sort lies in the developing concept that the relational interests of various members of the family are the true foundation for their legal status, one to another, and to the outside world. This concept sees the family as the basic social unit, upon which the rest of society relies for the initial psychological development and emotional grounding of children without which the children cannot grow into responsible members of society. In short, society relies on the family to perpetuate itself, and the relational interests of the child in the family have been considered legally protectable interests. A child has the right to the support, care, training, and love of both of its parents, and these rights may be protected against interference by third parties.

The majority has refused to recognize the cause of action for policy reasons involving changes in the family unit. In *Nash v. Baker, supra,* the court pointed to:

> those modern statutes abolishing cause of action for alienation of affections, breach of promise to marry, and related actions; the increasing failure of marriages, reportedly more than one in three ending in absolute divorce or permanent separation; and the recent liberalization of divorce in several more states, including a ground or grounds not based on "fault;" and the increase in the number of children whose parents have divorced and remarried; . . . .

*Id.* at 1339.

In addition, the majority raises "numerous practical objections," as enumerated by the court in *Nelson v. Richwagen, supra,* quoting from a note in a law review:[5]

> ". . . (1) Possibility of a multiplicity of suits . . .; (2) Possibility of extortionary litigation, for this action, always susceptible to fraud, would become even more so by virtue of its numerical increase and the relative tenuousness of the child's relationship; (3) Inability to define the point at which the child's right would cease, inasmuch as the status itself hypothesizes mutability . . .; (4) Inability of a jury adequately to cope with the question of damages, first, because injuries like that now under discussion are hard to measure in money and courts are averse to permitting the more or less conjectural awards based on mental suffering, and second, because damages thus assessed are apt to overlap, the number and ages of children ordinarily being noted in a parent's action."

*Id.,* 326 Mass. at 487, 95 N.E.2d at 546. *See Taylor v. Keefe, supra,* 134 Conn. at 161, 56 A.2d at 770.

> The minority answers these objections as follows:
> Assuming it to be true that to allow a right of recovery would increase litigation, that fact would be no valid reason for denying the right. . . . But the contention lacks factual basis.
>
> . . . .
>
> We also deem the reason . . . that courts are incapable of defining the child's rights and that juries are incapable of assessing its damages in such cases to be without merit. . . . [C]ourts and juries are required to do precisely those things in certain cases, and do so with complete success.

*Miller v. Monsen, supra,* 228 Minn. at 404-05, 37 N.W.2d at 546.

The majority, noting the absence of statutory and case law authority, has refused to create such a cause of action, on the ground that it would invade the province of the legislature.

---

[5] Note, Torts — Parent and Child — Right of Child to Recover Damages from One Who Has Enticed His Mother, 83 U.Pa.L.Rev. 276, 277 (1934).

*Mode v. Barnett, supra,* 235 Ark. at 649, 361 S.W.2d at 529; *Rudley v. Tobias, supra,* 84 Cal. App.2d at 457, 190 P.2d at 987; *Whitcomb v. Huffington, supra,* 180 Kan. at 344, 304 P.2d at 467-68; *Henson v. Thomas,* 231 N.C. 173, 176, 56 S.E.2d 432, 434 (1949); *Garza v. Garza, supra,* 209 S.W.2d at 1015-1016.

The minority responds that "it is the province of the court to 'fill in the gaps.' " *Johnson v. Luhman, supra,* 330 Ill. App. at 606, 71 N.E.2d at 814. The court in *Miller v. Monsen, supra,* stated:

> Novelty of an asserted right and lack of common law precedent therefor are no reasons for denying its existence. The common law does not consist of absolute, fixed, and inflexible rules, but rather of broad and comprehensive principles based on justice, reason, and common sense.

*Id.* at 406, 37 N.W.2d at 547.

In several of the majority jurisdictions, the courts' refusal to recognize a minor child's cause of action was influenced by the fact that a spouse's action for alienation of affections had been abolished by statute in those jurisdictions. *Rudley v. Tobias, supra,* 84 Cal. App. 2d at 456-57, 190 P.2d at 987; *Miller v. Kretschmer, supra,* 374 Mich. at 461, 132 N.W.2d at 142-43; *Kleinow v. Ameika, supra,* 19 N.J. Super. at 167-68, 88 A.2d at 32-33; *Katz v. Katz, supra,* 197 Misc. at 413, 95 N.Y.S.2d at 865.

Yet, in *Russick v. Hicks, supra,* the District Court of Michigan held that a minor child has a cause of action for alienation of affections, in spite of a Michigan statute, which read:

> "All civil causes of action for alienation of affections . . . are hereby abolished."

*Id.* at 286. The court stated that the statute was intended to abolish only "the traditional alienation-of-affections suit" by a spouse. *Id.*

The validity of *Russick v. Hicks, supra,* as precedent, however, is dubious in view of the holding of *Miller v.*

*Kretschmer, supra*. In *Miller v. Kretschmer, supra*, the Michigan Supreme Court held that a more recent statute[6]

> has unquestionably spelled out a legislative decision to abolish all actions for alienation of affections, including those of minor children . . . .

*Id.* at 461, 132 N.W.2d at 143. The court quoted a comment the Joint Committee on Michigan Procedural Revision made regarding the statute:

> " 'Reenactment of these provisions . . . will have the advantage of putting to rest the unfortunate holding of *Russick v. Hicks*, 85 F.Supp. 281 (1949), in which the court said the statute didn't mean what it said.' "

*Id.*

The remaining three minority cases represent only two jurisdictions — Minnesota and Illinois.[7] The most recent of these cases is thirty years old.[8]

After consideration of the parties' respective arguments, we join the majority of jurisdictions in holding that a minor child does not have a cause of action for alienation of affections. We agree with the "practical objections" enumerated in *Nelson v. Richwagen, supra*. Additionally, for the policy reasons stated in *Nash v. Baker, supra*, we believe that it is inappropriate for this court to judicially recognize a claim for relief of the minor child as contended for by the appellant.

We, therefore, affirm the trial court's dismissal of the action by appellant, as next friend of James Richard Hunt II, a minor.

*Wayne D. Parsons (Hyman M. Greenstein* on the brief) for plaintiffs-appellants.

*Leland H. Spencer (Kelso, Spencer, Snyder & Stirling* of counsel) for defendant-appellee.

---

[6] That statute reads:

The following causes of action are abolished:

(1) alienation of the affections of any person, animal, or thing capable of feeling affection, whatsoever.

*Id.* at 461, 132 N.W.2d at 142.

[7] Johnson v. Luhman, *supra*, and Daily v. Parker, *supra*, arose in Illinois state and federal courts, respectively.

[8] Miller v. Monsen, 228 Minn. 400, 37 N.W.2d 543 (1949).