No. 47,412

F. G. MANZANARES, et al., Appellees, ELIZABETH MADDEN, et al., (Intervenors) *Appellees-Cross-Appellants,* v. W. FLETCHER BELL, as Commissioner of Insurance, JAMES T. MCDONALD, as Secretary of Revenue, and ELTON D. LOBBAN, as Director of Vehicles, *Appellants-Cross-Appellees.*

(522 P. 2d 1291)

Opinion filed May 7, 1974.

*Curt T. Schneider,* assistant attorney general, and *L. M. Cornish, Jr.,* special assistant attorney general, argued the cause, and *Vern Miller,* attorney general, and *Mark L. Bennett,* special assistant attorney general, were with them on the brief for appellants and cross-appellees.

*Fred W. Phelps* and *Gene E. Schroer,* of Topeka, and *Patrick Kelly,* of Wichita, argued the cause and were on the brief for appellees and cross-appellants. *R. R. Barnes,* of Ratner, Mattox, Ratner, Ratner & Barnes, of Wichita, and the firms of Schnider, Shamberg & May, of Kansas City, and Kidwell, O'Keefe & Williamson, Chartered, and Michaud, Cranmer, Syrois & Post, of Wichita, were on the brief for Appellee Elizabeth Madden, et al.

*Raymond L. Spring,* of Topeka, was on the brief amici curiae for American Insurance Association, American Mutual Insurance Association, and National Association of Independent Insurers.

The opinion of the court was delivered by

Fatzer, C. J.: This appeal involves the constitutionality of legislation commonly known as the Kansas No-Fault Insurance Act.

In 1973, the Kansas Legislature enacted Substitute for House Bill 1129 which is published as Chapter 198 of the 1973 Session Laws (L. 1973, Ch. 198), and is incorporated in the Kansas Statutes Annotated as K. S. A. 40-3101 through 40-3121. The Act was defined by Section 1 as the "Kansas Automobile Injury Reparations Act" and became effective January 1, 1974. Because of the posture of this case on appeal and events which occurred subsequent to the judgment below, it is deemed necessary to set forth

in detail those events and the issues which have arisen as result of their occurrence.

In September 1973, the plaintiff, F. G. Manzanares, a resident of the state of Kansas and the owner of an insured motor vehicle, commenced this action in the district court against W. Fletcher Bell, as Commissioner of Insurance, James T. McDonald, as Secretary of Revenue, and Elton D. Lobban, as Director of Vehicles. The plaintiff filed the action individually and on behalf of all motor vehicle owners and operators in Kansas. (K. S. A. 1973 Supp. 60-223.) His first amended petition alleged the unconstitutionality of Substitute for House Bill 1129 upon several grounds and prayed judgment declaring the Act unconstitutional, and for an order permanently enjoining the defendant state officials from implementing and enforcing the terms and conditions of the Act. (K. S. A. 60-907.) He also sought declaratory relief pursuant to K. S. A. 60-1701.

On October 5, 1973, Elizabeth Madden, a resident of Kansas and the owner of an insured motor vehicle, intervened and prayed for relief similar to that sought by the plaintiff. Her intervening petition was filed as a class action. (K. S. A. 1973 Supp. 60-223.)

Evidence was heard, and on January 4, 1974, the district court found Substitute for House Bill 1129 unconstitutional upon the grounds that (1) the title of the Act was defective because it made no mention of first party coverage and violated Article 2, Section 16 of the Kansas Constitution; (2) Section 13 (a) was invalid because its language required the injured party to repay his insurer all damages recovered from a negligent tort-feasor, and (3) Section 17 was invalid as ambiguous and accorded dissimilar treatment to injured persons depending upon whether the tort-feasor was insured as required by the Act in violation of the due process and equal protection clauses of the federal and state Constitutions. The district court announced it would file a memorandum decision and journal entry at a later date, and that its judgment would not be effective until the journal entry was filed. (K. S. A. 60-258.)

On January 24, 1974, the district court filed its memorandum opinion and journal entry and ordered that its judgment be stayed until February 7, 1974. This appeal was immediately perfected. On January 25, 1974, Senate Bill 918 was introduced in the Kansas Legislature to correct the constitutional infirmities of Substitute for House Bill 1129 as determined by the district court, and to repeal that Act in its entirety. Upon application of the defendants,

this court stayed the judgment of the district court "until the decision of this court becomes final or until further order of this court," and granted the appeal a preferential setting. It was further ordered:

"In the event the legislation in question is amended by the 1974 legislature, the parties are directed to brief the effect, if any, such amendments should have on the decision of this court."

Senate Bill 918 passed the House and Senate by substantial majorities. It was signed by the governor on February 19, 1974, and became effective upon publication in the official state paper February 22, 1974. Thus, Senate Bill 918 became the effective no-fault law of Kansas on that date, repealing K. S. A. 40-3101 et seq., although the latter statutes were applicable no-fault law from January 1, until February 22, 1974—a period of 53 days.

The appeal now before the court comes to us in a unique manner. Substitute for House Bill 1129, which was before the court below, and by that court held unconstitutional for the defects previously indicated, no longer exists as the law of the state of Kansas. During the pendency of this appeal the Legislature repealed Substitute for House Bill 1129 and enacted Senate Bill 918 in its stead. Since this is a proceeding for an injunction against state officials, and the judgment of this court must operate *in futuro*, it would be a futile act to enjoin state officials from enforcing a law which no longer exists.

The posture of this appeal is not without precedent. In *Ash v. Gibson*, 145 Kan. 825, 67 P. 2d 1101, the city of Ottawa adopted an ordinance restricting gasoline transports from hauling loads of more than 600 gallons on city streets. An action was brought to enjoin the enforcement of the ordinance. The lower court found the ordinance was invalid and enjoined its enforcement. Reversing, this court held the city had authority to adopt the ordinance. A motion for rehearing was filed, but prior to argument, a statute was enacted which withdrew the city's authority to adopt the ordinance. One question presented on rehearing was whether this court should consider the effect of a statute which was not in force when the lower court entered judgment. We held the injunctive relief sought operated *in futuro* and therefore required this court to consider the effect of the statute passed during the pendency of the appeal. In the opinion on rehearing, *Ash v. Gibson*, 146 Kan. 756, 74 P. 2d 136, it was said:

". . . The entire matter is still in the hands of this court and but little

would be gained should we take the position that we would consider only such statutes as were in effect when the trial court entered its judgment, or as were in effect when this court filed its first opinion. The only practical result would be that a new action would be filed immediately, and the trial court would take such action at the trial, and this court would take such action on appeal, as we are asked to do now, that is, consider the effect of the enactment of chapter 283 of the Laws of 1937 on the power of the city to enact the ordinance in question." (1. c. 758.)

A similar point was presented in *Dairy Belle, Inc. v. Freeland*, 175 Kan. 344, 264 P. 2d 894. The questions involved were the construction and the constitutionality of G. S. 1949, 65-720 and 721—the "Ice Milk" statutes. During the pendency of the appeal, the Legislature enacted additional laws dealing with the same subject matter as the challenged statutes. We directed that counsel submit briefs and arguments on the effect to be given the new law. In the opinion it was said:

". . . Although our order of May 14, 1953, ordered argument on the effect to be given chapter 8, Laws of 1953 [the new law], counsel have argued also the question of the constitutionality of that chapter. We shall consider both questions. . . ." (1. c. 345.)

At this juncture we note that Senate Bill 918 repealed the 21 sections of K. S. A. 40-3101 *et seq.* (the original Kansas No-Fault Act), reinacted 16 sections without change, and altered the remaining five sections as indicated below:

(1) Section 5 changed K. S. A. 40-3105 (*d*), (*e*) and (*f*) to eliminate the exemptions provided commercial and non-resident motor vehicles.

(2) Section 6 changed K. S. A. 40-3106 making the Kansas No-Fault law applicable to all non-resident motor vehicle owners, and requiring that every insurance company, as a condition to transacting business in this state, provide insurance to its policyholders complying with the Kansas Act, wherever located.

(3) Section 13 (*a*) changed K. S. A. 40-3113 (*a*) to require an injured person repay his insurance carrier duplicative PIP benefits recovered from the tort-feasor.

(4) Section 16 changed K. S. A. 40-3116 to provide assigned claim plan benefits to all persons injured in this state, except the operator of a motorcycle for which the owner has rejected PIP benefits pursuant to Section 7 (*f*) and eliminated the requirement that assigned claim benefits be reduced by collateral benefits the injured person was entitled to receive.

(5) Section 17 changed K. S. A. 40-3117 (*a*) by removing the tort "shield" provision and now permits recovery from the tort-feasor for all economic losses, but still required the injured person incur reasonable medical expenses in excess of $500, or suffer one of the described specified injuries before recovering non-pecuniary losses. Section 17 retains the "threshold" provision.

Although the law in question has been changed by the enactment of Senate Bill 918, it is clear the basic issues remain the same. Those issues are of the utmost public importance and the parties claim the essential constitutional defects are the same in the new act as in the old. When those issues are bared, what is really involved is the constitutionality of the basic no-fault insurance concept with its built-in limitations on causes of action in tort arising out of injuries received in automobile accidents. That issue still exists between the parties and will continue to exist, even though it be determined that Senate Bill 918 corrected those matters thought by the district court to be constitutionally defective. This court is of the opinion that the public interest would be served if the court now considers the effect of Senate Bill 918 and resolves the constitutional questions at this time. Otherwise, as we previously observed in *Ash v. Gibson,* supra, "the only practical result would be that a new action would be filed immediately, and the trial court would take such action in the trial, and this court would take such action on appeal, as we are asked to do now. . . ."

Accordingly, we shall consider the constitutionality of basic no-fault concepts.

The main thrust of the arguments advanced are directed at specific sections of the no-fault legislation. Those sections alter traditional tort liability reparation and may be considered the distinguishing characteristics of the no-fault insurance legislation. Hence, we deem it advisable to summarize its basic features. In doing so, we shall not undertake a comprehensive discussion of Senate Bill 918, or its scope and operation.

Hereafter all reference pertaining to sections of the Kansas No-Fault Act is to Senate Bill 918 unless otherwise indicated.

The liability insurance prescribed by the no-fault legislation is mandatory, and the coverage afforded is extensive. Stated in summary fashion, Section 4 requires every motor vehicle owner to purchase liability insurance as specified by the Act. The operation of a motor vehicle on a highway of this state or property open to

public use is prohibited, unless the prescribed liability insurance coverage is in force. Provision is made for self-insurance by those who qualify.

The liability insurance coverage required in every policy is set out in Section 7. Section 7 (e) prescribes policy limitations and provides for a minimum coverage of not less than $15,000 for bodily injury or death of one person in an accident, and not less than $30,000 for bodily injury or death of two persons in an accident. Minimum coverage of not less than $5,000 for property damage is required.

Section 7 (f) requires that every liability insurance policy shall contain personal injury protection benefits. The section's phrase "include personal injury protection benefits" merges traditional third party liability insurance with first party coverage. The term "personal injury protection benefits" (hereafter PIP benefits) embraces six types of coverage, which include payment of the following allowances:

(1) Disability benefits—"loss of monthly earnings" due to an injured person's inability to engage in gainful employment and is limited to $650 per month for one year. (Sec. 3 [b].)

(2) Funeral benefits—burial or cremation, and limited to $1,000 per individual. (Sec. 3 [d].)

(3) Medical benefits—all reasonable medical expenses, and limited to $2,000 per person. (Sec. 3 [k].)

(4) Rehabilitation benefits — psychiatric services, occupational therapy or occupational training or retraining. (Sec. 3 [r].)

(5) Substitution benefits—hiring a person to render services the injured person normally performs. (Sec. 3 [w].)

(6) Survivor benefits—affords a decedent's survivor or survivors disability and substitution benefits. (Sec. 3 [y].)

Direct benefits are provided to the named insured, members of his family residing in his household, guest passengers, and others operating the insured motor vehicle with permission, and to pedestrians struck by the insured vehicle. Those persons are entitled to payment of medical expenses, reimbursement of lost wages, and other benefits subject to the limitations noted. Payment of PIP benefits must be made within 30 days by the insuring company regardless of fault in the causation of the injury. Moreover, Section 16 creates an assigned claims plan whereby any person who suffers an injury in this state arising out of a motor vehicle accident may

receive PIP benefits if such benefits are not otherwise available to the injured person under the conditions specified in the section.

In exchange for the PIP benefits provided by Section 7, the injured person's right to recovery in tort is tempered by the "threshold" provision of Section 17. That section permits recovery of damages for pain, suffering, inconvenience or other non-pecuniary loss only when the reasonable value of medical services for the injury is $500 or more. Recognizing that certain injuries entail considerable pain and suffering warranting monetary compensation regardless of medical expenses incurred, the Legislature provided by way of exception to the foregoing limitation that damages for pain and suffering could be sought in all cases involving specified injuries. Those injuries must consist in whole or in part of permanent disfigurement, fracture to a weight bearing bone, a compound, comminuted, displaced or compressed fracture, loss of a body member, permanent injury within reasonable medical probability, permanent loss of bodily function or death. Any person whose injuries are not within the specified categories or whose medical expenses are less than $500 cannot recover for non-pecuniary loss such as pain, suffering, mental anguish or inconvenience.

We do not wish to be understood in the foregoing discussion as ruling on the operative effect of any part of Senate Bill 918, but we summarize its pertinent provisions only to permit a better understanding of that which follows.

We begin our consideration of the numerous questions presented by examining two contentions advanced by the plaintiff which, if accepted, would change significantly our approach to the case. The plaintiff first contends the $500 medical threshold provision of Section 17 "takes away property rights without compensation" in violation of Section 18 of the Bill of Rights of the Constitution of the state of Kansas as well as the equal protection and due process clauses of the Fourteenth Amendment. In arguing the point, the plaintiff questions the Legislature's authority to alter traditional tort liability concepts, and in so doing, he ignores the distinction between an accrued and expected cause of action.

Traditionally, the burden of reparation for losses occasioned by motor vehicle accidents has fallen upon the party or parties found to be at fault. See e. g. *McDonald v. Yoder*, 80 Kan. 25, 101 Pac. 468; *Watkins v. Byrnes*, 117 Kan. 172, 230 Pac. 1048; *Strohmyer v. Ventura*, 178 Kan. 597, 290 P. 2d 1001; *Morris v. Hoesch*, 204 Kan.

735, 466 P. 2d 272; *VonWolff v. Sewell,* 211 Kan. 215, 505 P. 2d 687; *Beardsley, Executor v. Weber,* 213 Kan. 427, 516 P. 2d 936.) The Kansas No-Fault Act represents a legislative departure from common-law fault reparation procedures. This change flows from the compulsory first party coverage (Sec. 7 [f]), and the threshold provision which limits recovery for non-pecuniary losses. (Sec. 17.)

Section 18 of our Bill of Rights provides:

"All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

The Fourteenth Amendment to the United States Constitution and Section 18 of the Bill of Rights of the Kansas Constitution do not forbid the creation of new rights, or the abolition of rights recognized by the common law. (*Wright v. Pizel,* 168 Kan. 493, 214 P. 2d 328; *Munn v. Illinois,* 94 U. S. 113, 24 L. Ed. 77; *Silver v. Silver,* 280 U. S. 117, 74 L. Ed. 221, 50 S. Ct. 57.) In *Williams v. City of Wichita,* 190 Kan. 317, 374 P. 2d 578, we said:

". . . From the earliest days of Kansas history, flexibility in the common law has been carefully preserved (G. S. 1949, 77-109). Indeed, the great office of statutes is to remedy defects in the common law as they are developed and to adapt it to the changes of time and circumstances. That the legislature may change the principle of the common law and abrogate decisions made thereunder when in its opinion it is necessary to the public interest is well settled. (Citations.)" (l. c. 331, 332.)

In the recent case of *Steele v. Latimer,* 214 Kan. 329, 521 P. 2d 304, it was said:

"It has been said that the development of the common law has been determined largely by the social needs of the society it was designed to serve, and that the capacity for growth and change is one of its most significant features. (*Linkins v. Protestant Episcopal Cathedral Found.,* 187 F. 2d 357, 28 A. L. R. 2d 521; *Lembke v. Unke,* 171 N. W. 2d 837 [N. Dak.]; 15 Am. Jur. 2d, Common Law, § 2, pp. 795, 796.) The most casual student of ages past would agree that the principle of change runs deeply through human history and like a golden thread weaves new 'people requirements' into the fabrics of altered social patterns.

"Even though the common law of England has provided the basics of the law in this state since territorial days (*Hoffman v. Dautel,* 192 Kan. 406, 414, 388 P. 2d 615), it is clear, by legislative pronouncement, that it may be modified 'by constitutional and statutory law, judicial decisions, and the *conditions and wants of the people.*' (Emphasis supplied.) (K. S. A. 77-109.)

"This court has never been disposed, as was announced in *Wright v. Jenks,* 124 Kan. 604, 609, 261 Pac. 840, 'to resuscitate [the] obsolete subtlety of the common law.' To the contrary, where a common law principle has been found unsuited to the conditions and wants of the people of this commonwealth, its

application has been rejected. (*Isely Lumber Co. v. Kitch*, 123 Kan. 441, 445, 256 Pac. 133. . . ." (1. c. 332.)

While Section 18 of the Bill of Rights provides a broad field for the protection of persons, property and reputation, the vested rights contained therein are subject to change by legislative power, where the change is reasonably necessary in the public interest to promote the general welfare of the people of the state. We have never held one to have a vested right in the common-law rules governing negligence actions so as to preclude substituting a viable statutory remedy for common law causes of action. The decisions of this court are replete with instances of common-law rights being modified or abolished. (See *e. g. Shade v. Cement Co.*, 93 Kan. 257, 144 Pac. 249 [workmen's compensation]; *State, ex rel., v. Knapp*, 167 Kan. 546, 207 P. 2d 440 [riparian rights]; *Noel v. Menninger Foundation*, 175 Kan. 751, 267 P. 2d 934 [charitable immunity]; *Long v. Fischer*, 210 Kan. 21, 499 P. 2d 1063 [alienation of affection]; *Steele v. Latimer*, supra [covenant of habitability].) The foregoing is not intended to be exhaustive.

The No-Fault Act before this court does not totally abolish the common-law right to damages for personal injury; nor does it abolish the right to recovery for actual economic loss. It does provide a limitation on the right to recover non-pecuniary losses for pain, suffering, mental anguish and inconvenience. The Act prospectively modifies the common-law tort liability concept, and in no manner retroactively affects accrued common-law rights of redress. There is a plethora of authority that "[N]o person has a vested interest in any rule of law, entitling him to insist that it shall remain unchanged for his benefit." (*New York Central R. R. Co. v. White*, 243 U. S. 188, 198, 61 L. Ed. 667, 37 S. Ct. 247.) Accordingly, a "citizen may find that events occurring after passage of such a statute place him in a different position legally from that which he would have occupied had they occurred before passage of the statute." (*Pinnick v. Cleary*, 271 N. E. 2d 592, 599-600 [Mass. 1971].)

Moreover, the Kansas No-Fault Act assures all motor vehicle accident victims of prompt, efficient payment of certain economic losses. To the extent there is a limitation on a person's ability to recover non-pecuniary damages, the rights received in exchange are no less adequate. (*New York Central R. R. Co. v. White*, supra; *Arizona Employers' Liability cases*, 250 U. S. 400, 63 L. Ed. 1058, 39 S. Ct. 553; *Helvering v. Davis*, 301 U. S. 619, 81 L. Ed. 1307,

57 S. Ct. 904; *Pinnick v. Cleary,* supra; *Opinion of the Justices,* 304 A. 2d 881 [N. H. 1973]; *Kluger v. White,* 281 So. 2d 1 [Fla. 1973].) Such a person has no cause to complain solely because his rights are not now what they would have been had Senate Bill 918 not been enacted. (*City of Wichita v. White,* 205 Kan. 408, 469 P. 2d 287; *Munn v. Illinois,* supra; *New York Central R. R. Co. v. White,* supra.)

The plaintiff argues at length that the No-Fault Act requiring a motor vehicle owner to purchase liability insurance containing first party coverage (PIP) benefits places an unwarranted burden on the right to travel freely. He contends that since the right to travel is a fundamental right, this court is required to apply the "compelling state interest" test and not the "reasonable relation" test in determining the act's constitutionality. He asserts the right to travel in Kansas in 1974 is tantamount to the right to travel by private automobile, and the Act places an unwarranted burden on that right where no compelling state interest has been shown to exist. The point is not well taken.

We agree that freedom to travel throughout this state and this nation is a fundamental right. *(Aptheker v. Secretary of State,* 378 U. S. 500, 12 L. Ed. 2d 992, 84 S. Ct. 1659; *Shapiro v. Thompson,* 394 U. S. 618, 22 L. Ed. 2d 600, 89 S. Ct. 1322; *Dunn v. Blumstein,* 405 U. S. 330, 31 L. Ed. 2d 274, 92 S. Ct. 995.) But that does not resolve the issue. Whether the "compelling state interest" test is applicable requires this court to consider the basis of the classification challenged, the interest affected by the legislation, and the governmental interest necessitating the classification. (*Memorial Hospital v. Maricopa County* ____ U. S. ____, 39 L. Ed. 2d 306, 94 S. Ct. 1076; *Dunn v. Blumstein,* supra; *Kramer v. Union School District,* 395 U. S. 621 23 L. Ed. 2d 583, 89 S. Ct. 1886; *Skinner v. Oklahoma,* 316 U. S. 535, 86 L. Ed. 1655, 62 S. Ct. 1110.)

The basis of the legislative classification is the automobile, and the No-Fault Act affects alike all who own, operate, maintain or use such a vehicle. The interest affected by Senate Bill 918 is not the right to travel freely. What is required is motor vehicle liability and first party insurance as a condition precedent for the privilege of operating a motor vehicle upon the public highways of this state. While limitations upon the police power are not susceptible to precise definition, authorities are unanimous that under the police power the state may regulate travel upon the public highways. The right to operate a motor vehicle upon the public highway is a privilege, not a natural right, and that privilege is subject to rea-

sonable regulation. (*Lee v. State*, 187 Kan. 566, 358 P. 2d 765; *Marbut v. Motor Vehicle Department*, 194 Kan. 620, 400 P. 2d 982; *Agee v. Kansas Highway Commission*, 198 Kan. 173, 422 P. 2d 949; *Popp v. Motor Vehicle Department*, 211 Kan. 763, 508 P. 2d 991.) The power of the Legislature to control the operation of motor vehicles includes the power to enact legislation affecting the reciprocal rights and duties of all owners, operators or occupants when those rights and duties arise out of such operation. (*Wright v. Pizel*, supra.) Although our decision in *Henry v. Bauder*, 213 Kan. 751, 518 P. 2d 362, declaring the Kansas guest statute unconstitutional, overruled *Wright v. Pizel*, supra, that decision was clearly on grounds other than legislative power.

The need to correct flaws inherent in the fault oriented reparation system has been the subject of spirited debate. (James & Law, Compensation for Auto Accident Victims: A Story of Too Little and Too Late, 26 Conn. B. J. 70 [1952]; Morris & Paul, The Financial Impact of Automobile Accidents, 110 U. Pa. L. Rev. 913 [1962]; Keeton & O'Connell, Basic Protection for the Traffic Victim [1965].) Seven major proposals for vehicle accident compensation reform have been advanced. Presently twenty of our sister states have considered or enacted legislation directed at reparation reform. (See: The INCL Brief, Nov. 1973, Vol. 3, No. 2, Section of Insurance, Negligence & Compensation Law, American Bar Association.) The enactment of the Kansas No-Fault Act culminated many years of studying the present tort liability insurance system and its inability to deliver promptly compensation to automobile accident victims. The Act is a legislative response to a growing public demand for a change in the manner society deals with the enormous legal, social and economic problems resulting from motor vehicle accidents. Every citizen of this state is affected by the carnage occasioned by motor vehicle accidents ocurring upon our highways. The state has an interest in protecting those who use the public highways and that interest is not limited to accident prevention. (*City of Wichita v. White*, supra.)

The Kansas No-Fault Act does not penalize a person's right to travel freely. The governmental interest furthered by Senate Bill 918 justifies the compulsory liability and first party insurance coverage so as to insure prompt compensation to accident victims injured in the operation or use of a motor vehicle. Accordingly, there exists no reason for applying the "compelling state interest" test. Nor do we perceive any reason to conclude the Act is overly broad

in the face of a less restrictive alternative which would achieve the same ends.

In view of the foregoing conclusion, we shall apply the "reasonable relation" test in determining whether Senate Bill 918 violates due process and equal protection principles.

In *Henry v. Bauder,* supra, we discussed those constitutional guaranties and said:

". . . The equal protection clause of the Fourteenth amendment to the United States Constitution finds its counterpart in Sections 1 and 2 of the Bill of Rights of the Kansas Constitution which declares in substance that 'all men are possessed of equal and inalienable natural rights, among which are life, liberty and the pursuit of happiness,' and that 'all free governments . . . are instituted for the equal protection and benefit of the people.' While these two provisions of our Bill of Rights declare a political truth, they are given much the same effect as the clauses of the Fourteenth Amendment relating to due process and equal protection of the law. . . ." (1. c. 752.)

While the plaintiff and intervenor have commingled their arguments as to the due process and equal protection clauses, proper consideration requires us to discuss them separately.

Two arguments have been advanced by the parties regarding the infringement of Senate Bill 918 upon the constitutional guaranty of due process of law.

First, the plaintiff contends Sections 4 and 7 violate the due process guaranty by depriving motor vehicle owners the freedom of choosing for themselves the type and extent of insurance protection suited to their needs. He argues that premiums charged for the first party insurance coverage (PIP benefits) mandated by those two sections is a taking of property without due process of law. Second, the intervenor contends that various sections of the Act are vague and ambiguous violating the due process guaranty.

In determining whether a legislative scheme transgresses upon the guarantee of due process of the law, the applicable test is whether the legislation bears a "reasonable relation" to a permissible legislative objective. (*City of Colby v. Hurtt,* 212 Kan. 113, 509 P. 2d 1142; *City of Lyons v. Suttle,* 209 Kan. 735, 498 P. 2d 9; *Pinkerton v. Schwiethale,* 208 Kan. 596, 493 P. 2d 200.) The rules governing the supreme court in applying this test were considered in *Tri-State Hotel Co. v. Londerholm,* 195 Kan. 748, 408 P. 2d 877, wherein we stated:

" 'This court is by the Constitution not made the critic of the legislature, but rather, the guardian of the Constitution; and every legislative act comes before this court surrounded with the presumption of constitutionality. That

presumption continues until the Act under review clearly appears to contravene some provision of the Constitution. All doubts of invalidity must be resolved in favor of the law. It is not in our province to weigh the desirability of social or economic policy underlying the statute or to question its wisdom; those are purely legislative matters. . . . While the legislature is vested with a wide discretion to determine for itself what is inimical to the public welfare which is fairly designed to protect the public against the evils which might otherwise occur, it cannot, under the guise of the police power, enact . . . legislation . . . which violates the Constitution. . . ." (l. c. 760.)

Moreover, if a state of facts could exist which would justify the legislation, it must be presumed to have existed when the legislation was adopted. (*Munn v. Illinois,* supra; *McGowan v. Maryland,* 366 U. S. 420, 426, 427, 6 L. Ed. 2d 393, 81 S. Ct. 1101.)

Does there exist a reasonable basis for requiring motor vehicle owners to carry PIP coverage? Plaintiff maintains none of the alleged evils exist in Kansas which have prompted the "rash" of no-fault legislation nationally. The argument is one of policy, not law. This court does not decide nor weigh the beneficial results flowing from any particular legislative policy. (*Williams v. City of Wichita,* 190 Kan. 317, 374 P. 2d 578.) We must presume that, in adopting the No-Fault Act, the Legislature intended to improve the fault oriented reparation system. Concern over the inability of the present tort liability insurance system to deliver compensation promptly is by no means a new issue. The belief that defects in the system could be remedied only by far-reaching legislative reforms has fermented for over 40 years. A major study in this area was published in 1932 by the Columbia University Council for Research in the Social Sciences. The committee concluded that:

"The generally prevailing system of providing damages for motor vehicle accidents is inadequate to meet existing conditions. It is based on the principle of liability for fault which is difficult to apply and often socially undesirable in its application; its administration through the courts is costly and slow, and it makes no provision to ensure the financial responsibility of those who are found to be liable." (Report by the Committee to study compensation for automobile accidents. Philadelphia, Press of International Printing Co., 1932, p. 216.)

While the committee recognized that compulsory liability insurance and financial responsibility law would improve the then-existing system, it recommended far more sweeping changes, favoring a plan of compensation with limited liability and without regard to fault, analogous to that of the Workmen's Compensation laws.

Change was, as it always is, slow in coming. Many states attempted various legislative schemes such as compulsory insurance and financial responsibility laws to provide reparation for economic losses sustained by the crash victims. In 1965 a major study was made which is generally regarded as the foundation of most so-called "no-fault" legislation. (Keeton & O'Connell, Basic Protection For the Traffic Victim [1965].) In 1968, the United States Congress, in a joint resolution, called for a study and report by the United States Department of Transportation, and observed that:

". . . [T]here is growing evidence that the existing system of compensation . . . is inequitable, inadequate and insufficient and is unresponsive to existing social, economic and technological conditions. . . ."

". . . There is needed a fundamental reevaluation of such system, including a review of the role and effectiveness of insurance and the existing law governing liability." (Pub. L. 90-313, 82 Stat. 126.)

The directed study published in 1971 by the United States Department of Transportation (DOT), Motor Vehicle Crash Losses and their Compensation in the United States, reached the same conclusion. All studies concluded that the risk of tort liability based upon negligence is not a significant factor in inducing vehicle operators to drive more carefully; that the tort system of reparations based upon fault is excessively expensive and inefficient as a means of compensating automobile crash victims; that compensation distribution to accident victims under the tort system is inequitable in that it commonly results in overpayment for minor injuries, gross underpayment for those more seriously injured, and long delays in receipt of compensation.

In 1972 the Kansas Insurance Department, in a study entitled "No-Fault Automobile Insurance and its Role in Kansas" concluded that ". . . all the forces engaged in this controversy are in agreement that some changes in the automobile bodily injury insurance system are necessary. . . ." Without question there has been debate and controversy surrounding the enactment of the Kansas No-Fault Act. This is nothing new for change admits of controversy, and, generally speaking, diversity of opinion between those holding honest and sincere convictions follows. It cannot be denied there exists in this state a substantial and serious body of thought supporting the view that changes are required in the reparation system for automobile crash victims.

That concern is the cornerstone of legislative action for compen-

sating motor vehicle accident victims. Such concern has accompanied the rising predominance of the motor vehicle in our society, and is deeply imbedded in the legislative and judicial history of this state. As early as 1931, compulsory liability insurance for common carriers was required in this state. (L. 1931, Ch. 236, § 21.) Few attempts to challenge that legislation were made, and in every case the legislative classification was held constitutional. (*Louis v. Boynton,* 53 F. 2d 471; *Continental Baking Co. v. Woodring,* 55 F. 2d 347, aff'd 286 U. S. 352, 76 L. Ed. 1155, 52 S. Ct. 595; *Flowers v. Fidelity & Casualty Co.,* 156 F. 2d 586 [10th Cir. 1946].) In 1939 the growing concern over the number of uncompensated automobile accident victims found expression in the state's first financial responsibility law. (L. 1939, Ch. 86.) However, that legislation affected only persons convicted of certain offenses or persons who failed to satisfy a judgment arising out of a vehicle accident and required them to file proof of future financial responsibility. Failure to comply resulted in revocation of the person's license. See: Megaffin, Motor Vehicle Financial Responsibility and Kindred Laws, 25 J. B. A. K. 242 (1957).

The inability of the financial responsibility law to accomplish the intended purpose resulted in the law being repealed and replaced by the Motor Vehicle Safety Responsibility Act. (Comment: The New Kansas Motor Vehicle Safety Responsibility Act, 6 Kan. L. Rev. 358 [1958].) The purpose of the Safety Responsibility Act was to afford members of the public protection from irresponsible drivers by requiring financial security from drivers and motor vehicle owners involved in vehicle accidents. (*Agee v. Kansas Highway Commission,* supra.) Again, in 1968 the Legislature spoke on the subject to further insure compensation was provided victims of automobile accidents; it required uninsured motorists coverage be offered in every automobile liability insurance policy for vehicles registered in this state. (K. S. A. 40-284.) The obvious legislative purpose in mandating the offer of uninsured motorist coverage was to correct flaws in the safety responsibility Act. That coverage was designed to compensate innocent persons injured through the wrongful conduct of uninsured motorists who were unable to financially respond in damages. (*Winner v. Ratzlaff,* 211 Kan. 59, 505 P. 2d 606.) As remedial legislation, it was liberally construed to provide the intended protection. (*Clayton v. Alliance Mutual Casualty Co.,* 212 Kan. 640, 512 P. 2d 507, reh. den. 213 Kan. 84,

515 P. 2d 1115.) Senate Bill 918 repealed the Motor Vehicle Safety Responsibility Act and expresses again the legislative objective of correcting the inadequacies in compensating persons in the operation, maintenance and use of motor vehicles. The innovative scheme selected—no-fault insurance—requires a motor vehicle owner to carry self-protecting insurance.

This court addressed the issue of self-protecting legislation in *City of Wichita v. White*, supra. There, a constitutional challenge was made to an ordinance requiring the operator of a motorcycle or a passenger to wear protective headgear. The ordinance was worded in identical language to a state statute. The court considered the challenge present in that appeal "as one dealing with the state legislative enactment." (l. c. 409.) The appellant contended self-protection legislation was beyond the police power of the state, and that it transgressed upon his constitutional rights without corresponding benefits accruing to the public's general welfare. Finding the contentions without merit, we said:

". . . [C]hoosing between available alternatives in promoting highway safety is for the legislature, not for the courts. If requiring helmets is a protection against motorcycle drivers being hit and distracted by flying objects, such requirements need not be the only, or even the best way to accomplish the purpose of preventing such distraction to make it a proper exercise of the police power of the state.

"Over and above the interest the state has in protecting other users of the highways from the dangers of involvement in an accident is the fact that other users of the highway have an interest in the seriousness of the consequences of accidents as well as in the frequency of mishaps. Promoting highway safety is not to be limited to the prevention of accidents alone. It can include efforts to reduce the serious consequences of such accidents. . . .

"It is readily apparent that other motorists are affected by the consequences of an accident, and that is the test. *Therefore, the police power of the state may be exercised to minimize the consequences of collisions and accidents as well as to decrease the number of collisions and accidents.*" (l. c. 412.) (Emphasis supplied.)

The police power of the state embraces regulatory authority designed to promote the health, safety and welfare of the public. (*State v. Atkin*, 64 Kan. 174, 67 Pac. 519, aff'd 191 U. S. 207, 48 L. Ed. 148, 24 S. Ct. 124; *Hovis v. Refining Co.*, 95 Kan. 505, 148 Pac. 626; *State v. Weathers*, 205 Kan. 329, 469 P. 2d 292; *State, ex rel., v. Koscot Interplanetary, Inc.*, 212 Kan. 668, 512 P. 2d 416; *Reduction Company v. Sanitary Works*, 199 U. S. 306, 50 L. Ed. 204, 26 S. Ct. 100; *Bacon v. Walker*, 204 U. S. 311, 51 L. Ed. 499, 27 S. Ct. 289; *Atlantic Coast Line v. Goldsboro*, 232 U. S. 548, 58 L. Ed.

721, 34 S. Ct. 364; *Nebbia v. New York*, 291 U. S. 502, 78 L. Ed. 940, 54 S. Ct. 505.) It is axiomatic that if the police power of the state may be exercised to minimize the consequences of collisions and accidents, it likewise may be exercised to require a method of compensating promptly persons who suffer accidental bodily injury arising out of a motor vehicle accident. The requirement of purchasing insurance for the protection of others has long been held not to violate the due process guarantee. In *State v. Finley*, 198 Kan. 585, 426 P. 2d 251, it was said:

"It seems clear the legislature may require, as a condition to the right of operating a motor vehicle, the procurement of insurance or the furnishing of other proof of financial responsibility. . . ." (l. c. 594.)

Further, in *Henry v. Bauder*, supra, we said:

". . . [T]he modern trend is to make mandatory insurance coverage for all owners of motor vehicles. This is one of the basic concepts of no fault legislation which has been enacted or is being considered in practically every state in the nation today. . . ." (l. c. 761.)

In *Pinnick v. Cleary*, supra, a multilateral challenge was made against the Massachusetts no-fault insurance act. The plaintiff contended that by requiring him to insure himself against loss or injury through a private, profit making insurance company was a deprivation of due process of law. In reply, the court said:

". . . Even if the self-insurance were compulsory, however, it would create no constitutional problems. Any doubts as to the power of the Legislature to require the citizen, for the good of the public as a whole, to take measures for his own benefit have long since been settled in a series of cases sustaining such statutes. The fact that in many of these cases this feature of the act was not even attacked indicates the lack of gravity of the objection. . . ."

\*　\*　\*　\*　\*

"Nor can the plaintiff complain because the medium through which the . . . self-protection must be obtained is a private, profit-making corporation, as opposed to some kind of governmentally managed pool. . . . We see no distinction for due process purposes between the requirement of private insurance for self-protection and for the protection of others. It is an incidental and completely nonobjectionable concomitant of many regulatory statutes that citizens are required thereby to enter into transactions for their own benefit with private corporations. . . ." (271 N. E. 2d 592, 607, 608.)

No example of compulsory self-insurance could be clearer than old age and survivors' insurance, the constitutionality of which long has been accepted. *(Helvering v. Davis*, supra.)

We observe that no complaint is made of Section 2 of Senate Bill 918 which declares "[t]he purpose of this act is to provide a

means of compensating persons promptly for accidental bodily injury arising out of the ownership, operation, maintenance or use of motor vehicles in lieu of liability for damages to the extent provided herein." This is the heart of the Act. The rest treats of deitals and procedures. The legislation forms the basis for a different approach in solving the inadequacies of the tort liability system, and provides a new method of affording prompt compensation to motor vehicle accident victims. Under the declaration of Section 2 and other provisions of the Act, we now approach reparation of motor vehicle accident victims on the basis of the interest of all the citizens of this state without losing sight of, but tempering, the right of an individual to pursue traditional remedies in tort. The change is an appropriate one for the Legislature to make. Individuals do not live alone in isolation where they, at their will, can assert all of their individual rights without regard to the effect upon others. (*State, ex rel., v. Knapp,* 167 Kan. 546, 207 P. 2d 440.)

It is evident the Legislature was concerned with the possible burden on society occasioned by inadequate or nonexistent compensation for economic loss suffered by motor vehicle accident victims, particularly when viewed in the context of the large number of persons and total financial loss involved. By requiring motor vehicle liability policies to include first party PIP benefits, the Legislature may have eliminated the former necessity of resorting to litigation in many cases. The requirement of PIP coverage bears a reasonable relation to the subject of reparation for losses arising out of the ownership and operation of motor vehicles. Hence, the Kansas no-fault insurance plan being reasonably directed toward problems that affect the public welfare, including the economic welfare of the state and its citizens, the Act represents a proper and legitimate exercise of the police power of the state.

As indicated, the second due process challenge is that various sections of the No-Fault Act are vague and ambiguous. Discussion is limited to three penal sanctions. A criminal penalty is prescribed for the owner of an uninsured motor vehicle if he allows the uninsured vehicle to be operated upon a public highway or property open to use by the public. Likewise, any person who knowingly drives an uninsured motor vehicle is subject to criminal liability. (Sec. 4 [e].)

A motor vehicle owner is subject to a criminal penalty when his vehicle registration is revoked and thereafter he fails to surrender to the Director of Vehicles his registration receipt or license plate.

Revocation can occur only after a hearing. (Sec. 18 [*d*].) Any owner of a motor vehicle registered or required to be registered in this state who falsely certifies his financial security is subject to criminal liability. (Sec. 18 [*g*].)

We find it unnecessary to discuss at length this challenge. It is sufficient to say the three penal sanctions are not objectionable. The language in each section conveys a sufficiently definite warning as to the conduct proscribed when measured by common understanding and practice. (*State v. Hill,* 189 Kan. 403, 369 P. 2d 365, 91 A. L. R. 2d 750; *State v. Gunzelman,* 210 Kan. 481, 502 P. 2d 705; *State v. Finley,* 199 Kan. 615, 433 P. 2d 414; *State, ex rel., v. Fleming Co.,* 184 Kan. 674, 339 P. 2d 12; *State v. Ashton,* 175 Kan. 164, 262 P. 2d 123; *Grayned v. City of Rockford,* 408 U. S. 104, 33 L. Ed. 2d 222, 92 S. Ct. 2294; *United States v. Harriss,* 347 U. S. 612, 98 L. Ed. 989, 74 S. Ct. 808.)

The plaintiff and intervenor have advanced several arguments premised upon a denial of equal protection of the law. Traditionally, the test utilized in determining if a legislative enactment violates equal protection principles is whether the classification bears a rational relation to the purpose of the legislation. (*Henry v. Bauder,* supra; *Pinkerton v. Schwiethale,* supra; *State v. Consumers Warehouse Market,* 183 Kan. 502, 329 P. 2d 638; *McDonald v. Board of Election,* 394 U. S. 802, 22 L. Ed. 2d 739, 89 S. Ct. 1404.) The Legislature is presumed to act within its constitutional power despite the fact the application of its laws may result in some inequity. (*McGowan v. Maryland,* 366 U. S. 420, 6 L. Ed. 2d 393, 81 S. Ct. 1101.) The equal protection clause goes no further than to prohibit invidious discrimination. (*Williamson v. Lee Optical,* 348 U. S. 483, 99 L. Ed. 563, 75 S. Ct. 461.) In *Reed v. Reed,* 404 U. S. 71, 30 L. Ed. 2d 225, 92 S. Ct. 251, it was said:

". . . [T]his Court has consistently recognized that the Fourteenth Amendment does not deny to States the power to treat different classes of persons in different ways. *Barbier v. Connolly,* 113 U. S. 27 (1885), *Lindsley v. Natural Carbonic Gas Co.,* 220 U. S. 61 (1911); *Railway Express Agency v. New York,* 336 U. S. 106 (1949); *McDonald v. Board of Election Commissioners,* 394 U. S. 802 (1969). The Equal Protection Clause of that amendment does, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation,

so that all persons similarly circumstanced shall be treated alike.' *Royster Guano Co. v. Virginia,* 253 U. S. 412, 415 (1920). . . ." (l. c. 75-76.)

The parties contend the threshold provision of Section 17 is an arbitrary classification violating Section 18 of the Bill of Rights to the Kansas Constitution and the equal protection clause of the Fourteenth Amendment. Apparently the parties consider that Section 18 of our Bill of Rights is the complement of the due process and equal protection clauses of the Fourteenth Amendment. In this they are in error. As previously indicated, the Kansas Constitution's counterpart of the Fourteenth Amendment is Sections 1 and 2 of our Bill of Rights. (*Henry v. Bauder,* supra.) It is argued that the limitation on recovery of non-pecuniary loss for pain, suffering, mental anguish, and inconvenience invidiously discriminates between those persons injured by a motor vehicle and those who are injured by other than a motor vehicle. The question is not whether the threshold provision is discriminatory, but whether such differentiation is reasonably related to the public purpose sought to be accomplished.

The no-fault Act is a legislative directive to insure prompt and equitable compensation to persons injured by motor vehicles. This is accomplished by Sections 4 and 7 which provide direct benefits to the insured automobile owner, his family, guest passengers, others operating his car with permission, and to pedestrians struck by his motor vehicle, regardless of fault in the causation of the accident. As we have stated previously, the purpose of requiring prompt payment of compensation to persons injured in a motor vehicle is within the scope of the police power of the state. (*Pinnick v. Cleary,* supra; *City of Wichita v. White,* supra; *Opinion of the Justices,* supra.) One of the obvious purposes of the Legislature in limiting recovery under the threshold provision was clearly to eliminate minor claims for pain and suffering. The Legislature could reasonably have thought that the number of such cases (see DOT study) was largely connected with exaggerated claims for pain and suffering in instances of relatively minor injury. Our prior decisions are to the effect that subjective complaints of pain and suffering defy accurate monetary appraisal. (*Domann v. Pence,* 183 Kan. 135, 325 P. 2d 321; *Henderson v. Kansas Power & Light Co.,* 188 Kan. 283, 362 P. 2d 60.) In addition, minor "nuisance" claims were often overpaid, and as stated in *Pinnick v. Cleary,* supra, ". . . It was clearly proper for the Legislature to conclude that the benefits

of compensating an injured person for relatively minor pain and suffering, which as such entails no monetary loss did not warrant continuation of the practice when balanced against the evils it had spawned." (p. 610.)

We conclude the threshold limitation is a determination by the Legislature of public policy, and is reasonably related to problems that affect the public welfare, including the economic welfare of the state and its citizens, and therefore bears a rational relationship to the legislative objective of compensating persons promptly for accidental bodily injury arising out of the ownership and use of motor vehicles.

Plaintiff next contends the monetary medical expense standard, set at $500 by Section 17, arbitrarily and invidiously discriminates between various segments of the state's population; that the $500 standard is not reasonably related to any legitimate legislative purpose; and that such a standard discriminates against those persons who are economically disadvantaged. The contentions are without merit.

The principle stated by Mr. Justice Holmes in *Louisville Gas Co. v. Coleman*, 277 U. S. 32, 72 L. Ed. 770, 48 S. Ct. 423, is applicable to the questions presented:

". . . [W]hen it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark." (p. 41.)

The Act requires the medical expense standard be calculated on the basis of the "reasonable value" of the medical services, and not on the basis of out-of-pocket expenses. Actual expenditures for medical treatment are not conclusive as to their reasonable value. Evidence that the reasonable value of the medical expense was an amount different than the amount actually charged is admissible in all actions to which Section 17 applies. Persons entitled to receive free medical benefits may comply with the medical expense threshold by showing that the medical treatment received has an equivalent value of at least $500. Moreover, any person receiving necessary services, normally performed by a nurse, from a relative or member of the household is entitled to include the reasonable value of such services in meeting the threshold requirement.

Economic disparity in the market place is beyond judicial control. To equate absolute economic equality with equal protection of the

law is absurd. The "reasonable value" criterion permits sufficient flexibility for the courts of this state to insure that those who are economically disadvantaged are not deprived of a right enjoyed by the more affluent. Based upon the standard of "reasonable value" it is clear the medical expense standard is non-discriminatory upon its face.

An argument has been advanced challenging as a denial of equal protection the option given owners of motorcycles to reject in writing the coverage for personal injury protection benefits. It is claimed that Section 7 (*f*) in permitting the motorcycle owner to reject in writing PIP coverage grants him special privileges and immunities thereby creating an arbitrary classification not reasonably related to any legitimate purpose of the Act. Counsel argues there is no justfiication for exempting motorcycle owners from compulsory first party coverage.

It should be noted that this court is not made the superintendent of legislative activity under principles of equal protection. (*Griswold v. Connecticut,* 381 U. S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678.) Equal protection principles do not restrain the normal exercise of governmental power, but only abuse in the exertion of such authority. The principle of equal protection is not offended against simply because the exercise of the power may result in some inequality. (*Louisville & Nashville R. R. v. Melton,* 218 U. S. 36, 54 L. Ed. 921, 30 S. Ct. 676.) There is no precise application of the rule of reasonableness in classifying, and equality permits many practical inequalities. There need not be an exact exclusion or inclusion of persons and things. (*Magoun v. Illinois Trust & Savings Bank,* 170 U. S. 283, 42 L. Ed. 1037, 18 S. Ct. 594.) The state enjoys a wide range of discretion in distinguishing, selecting, and classifying, and it is sufficient if a classification is practical and not palpably arbitrary. (*Orient Insurance Company v. Daggs,* 172 U. S. 557, 43 L. Ed. 552, 19 S. Ct. 281; *Shelton v. Phalen,* 214 Kan. 54, 519 P. 2d 754; *State v. Weathers,* supra; *Tri-State Hotel Co. v. Londerholm,* 195 Kan. 748, 408 P. 2d 877; *Martin v. Davis,* 187 Kan. 473, 357 P. 2d 782, app. dismissed 368 U. S. 25, 7 L. Ed. 2d 5, 82 S. Ct. 1; *Board of County Comm'rs v. Robb,* 166 Kan. 122, 199 P. 2d 530.) ". . . To be able to find fault with a law is not to demonstrate its invalidity. It may seem unjust and oppressive, yet be free from judicial interference. The problems of government are practical ones and may justify, if they do not require, rough accom-

modations . . . What is best is not always discernible; the wisdom of any choice may be disputed or condemned. Mere errors of government are not subject to . . . judicial review. . . ." (*Metropolis Theatre Co. v. Chicago*, 228 U. S. 61, 69, 70, 57 L. Ed. 730, 734, 33 S. Ct. 441, 443.)

The regulation and control of traffic using the highway is a proper exercise of the police power in furtherance of the general welfare. This principle has been so well established that further discussion or citation of authorities is not deemed necessary. There is a legitimate reason for the Legislature to recognize the enate differences of the various types of vehicles using the highways and to regulate the use of them because of the difference in their characteristics. Illustrative of the Legislature's recognition of the difference between motor vehicles and motorcycles is the definition section of the Act regulating traffic on highways. K. S. A. 1973 Supp. 8-501 defines motor vehicles as:

"Every vehicle which is self-propelled and every vehicle which is propelled by electric power obtained from overhead trolley wires but not operated upon rails."

The same section defines motorcycles as:

"Every motor vehicle having a seat or saddle for the use of the rider and designed to travel on not more than three (3) wheels in contact with the ground, but excluding a tractor."

The difference in the physical characteristics of motorcycles has caused the Legislature to classify motorcycle owners and operators separately for the purpose of regulating their use of the highways. This was accomplished under the police power of the state. (See K. S. A. 1973 Supp. 8-577g to 8-577k.) Those statutes require that motorcycle owners and operators conform to certain standards in the use and operation of motorcycles which are not required of automobile owners and drivers. The establishment of such a classification for different treatment does not offend the due process and equal protection clauses of the Constitution since such classifications bear a reasonable relation to a legitimate public purpose. (*Wright v. Pizel,* supra.)

There is substantial reason for the Legislature to make a distinction in the No-Fault Act between automobile owners and operators and motorcycle owners and operators because (1) the general physical characteristics of the two types of vehicles considered in relation to the effects produced upon the operators or passengers

of such vehicles by an accident (*City of Wichita v. White*, supra); (2) a motorcycle operator involved in an accident will most surely be thrown from the vehicle onto the pavement, and since the weight of the vehicle is so much less than the weight of an automobile, a collision, even at reduced speeds, will obviously produce more serious personal injury to the motorcycle operator than the same collision would produce to the driver or passengers in an automobile; (3) while the automobile is used ordinarily as a family conveyance and is used primarily on the streets and highways, most motorcyclists use their motorcycles in addition to transportation, for pleasure and sports on and off the public ways, and (4) because of the difference in use, and primarily because of the vulnerability of the operator or passenger on the motorcycle to serious injury, the financial exposure for medical and hospital expenses, as well as loss of earnings, is much greater than it would be for an automobile driver under the same circumstances. Hence, the cost of procurring the personal injury protection benefits would be substantially greater for a motorcyclist than it would be for an automobile owner.

No perceptible inequality results from granting the owner of a motorcycle the option to purchase personal injury protection benefits. A motorcycle owner who rejects such coverage also loses his right to participate in the assigned claims plan (Sec. 16 [*a*] [1]), which right is available to any other injured noninsured person. Furthermore, the exercise of that option does not remove the motorcycle owner from the coverage of compulsory liability insurance as required by Section 4, nor from the threshold requirement of Section 17. The public is still protected from injuries occasioned by a motorcycle in three ways: (1) their own no-fault coverage; (2) the assigned claims plan, and (3) through third party liability coverage which is required of the motorcycle owner. It cannot be said the option granted such owner, commonly treated separately in many other ways (*Logquist v. Insurance Co.*, 263 N. C. 615, 140 S. E. 2d 12; *Westerhausen v. Allied Mutual Ins. Co.*, 258 Ia. 969, 140 N. W. 2d 719), is palpably arbitrary or irrational. The difference between the subject of a legislative classification need not be great, and if any reasonable distinction between the subjects as a basis for the classification can be found, the classification should be sustained. (16 Am. Jur. 2d, Constitutional Law, § 500, p. 875.)

In the areas of economic and social legislation, a statutory plan does not violate the equal protection clause merely because the

classifications contained therein are imperfect. (*Village of Belle Terre v. Boraas,* \_\_\_\_ U. S. \_\_\_\_, 39 L. Ed. 2d 797, 94 S. Ct. 1536, 42 L. W. 4475; *Jefferson v. Hackney,* 406 U. S. 535, 32 L. Ed. 2d 285, 92 S. Ct. 1724.) Nor does the equal protection clause require a state "to chose between attacking every aspect of a problem or not attacking the problem at all . . ." (*Dandridge v. Williams,* 397 U. S. 471, 487, 25 L. Ed. 2d 491, 503, 90 S. Ct. 1153, 1162.) The foregoing principles were stated by Mr. Chief Justice Hughes in *West Coast Hotel Co. v. Parrish,* 300 U. S. 379, 81 L. Ed. 703, 57 S. Ct. 578:

". . . This Court has frequently held that the legislative authority, acting within its proper field, is not bound to extend its regulations to all cases which it might possibly reach. The legislature 'is free to recognize degrees of harm and it may confine its restrictions to those classes of cases where the need is deemed to be clearest.' If 'the law presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied.' There is no 'doctrinaire requirement' that the legislation should be couched in all embracing terms. (Citations.) . . ." (300 U. S. at 400, 81 L. Ed. at 703, 57 S. Ct. at 585, 586.)

In *Williamson v. Lee Optical,* supra, Mr. Justice Douglas said:

". . . The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. *Evils in the same field may be of different dimensions and proportions, requiring different remedies.* Or so the legislature may think. (Citation.) *Or the reform may take one step at a time,* addressing itself to the phase of the problem which seems most acute to the legislative mind. (Citations.) *The legislature may select one phase of one field and apply a remedy there, neglecting the others."* (348 U. S. at 489, 99 L. Ed. at 573, 75 S. Ct. at 465.) (Emphasis supplied.)

We are of the opinion Section 7 (*f*) creates a classification which rests upon a real, not fictitious, basis, and that the plaintiff and intervenor failed to carry the burden of showing, as our decisions require (*Parmelee v. Ziegler,* 181 Kan. 703, 708, 314 P. 2d 340; *Board of County Comm'rs v. Robb,* supra), that legislative action with respect thereto was either arbitrary or capricious. It follows the contentions respecting the invalidity of Section 7 (*f*) cannot be sustained.

The plaintiff contends the requirement of Section 6 that a non-resident motorist must have a motor vehicle liability insurance policy meeting the requirements of the No-Fault Act places an unwarranted burden upon interstate travel. He further contends the provisions of the prior no-fault law (K. S. A. 40-3101 *et seq.*) which permitted dissimilar treatment between a Kansas resident

and a non-resident violates Section 17 of the Bill of Rights of the Constitution of Kansas, the equal protection clause of the Fourteenth Amendment, and Article 4, Section 2 of the Constitution of the United States.

The district court found plaintiffs and intervenor lacked standing to assert the rights of a non-resident. We agree. The constitutionality of governmental action can only be challenged by a person directly affected and such challenge cannot be made by invoking rights of others. (*City of Kansas City, v. Railway Co.*, 59 Kan. 427, 53 Pac. 468, 52 L. R. A. 321, aff. 176 U. S. 114, 44 L. Ed. 392, 20 S. Ct. 284; *Marks v. Frantz*, 179 Kan. 638, 298 P. 2d 316; *State, ex rel., v. Fleming Co.*, 184 Kan. 674, 339 P. 2d 12; *Delight Wholesale Co. v. City of Overland Park*, 203 Kan. 99, 453 P. 2d 82; *Strader v. Kansas Public Employees Retirement System*, 206 Kan. 392, 479 P. 2d 860.) Both plaintiff and intervenor are residents of this state. The class they represent is composed of "all citizens of Kansas," hence they may not litigate constitutional rights of a class they do not represent.

In addition to the foregoing equal protection arguments, the plaintiff and intervenor raise two other constitutional issues. It is contended the threshold provision of Section 17 deprives a person injured in a motor vehicle accident of the right to trial by jury, which violates Section 5 of the Bill of Rights to the Kansas Constitution. The constitutional guaranty of a right to trial by jury exists only in such cases as it existed at common law. (*Kimball and others v. Connor, Starks and others*, 3 Kan. 414; *Grosshans & Petersen, Inc., v. Givens*, 191 Kan. 506, 383 P. 2d 959; *Bourne v. Atchison, T. & S. F. Rly. Co.*, 209 Kan. 511, 497 P. 2d 110.) We have previously held the Legislature has the power to modify the common law. Section 5 of our Bill of Rights does not bar those changes. The section requires that triable questions of fact under existing substantive law be submitted to a jury. The threshold provision represents a legislative change in tort liability reparation and does not violate the right to trial by jury.

In addition, it is contended the No-Fault Act contains criminal sanctions which constitute an unlawful delegation of legislative power. Under the No-Fault Act the Commissioner of Insurance and the Director of Vehicles merely determine the existence or non-existence of a fact or condition requisite to the law's application. That determination is made at a hearing. We conclude the Act does not violate the delegation of powers doctrine. (*Rydd*

*v. State Board of Health*, 202 Kan. 721, 451 P. 2d 239; *Giddings v. City of Pittsburg*, 197 Kan. 777, 421 P. 2d 181; *State, ex rel., v. Fadely*, 180 Kan. 652, 308 P. 2d 537; *Marks v. Frantz*, supra.)

We turn to the defendant's contention the district court erred in concluding the title to Substitute for House Bill 1129 (K. S. A. 40-3101, *et seq.*) violated Article 2, Section 16 of the Kansas Constitution. It would serve no useful purpose to prolong this opinion with an extended discussion of this point. We have carefully examined the title to the Act and find it embraces but one subject which is clearly expressed in its title and no constitutional defect exists.

Likewise, the court has examined the contention the district court erred in its construction of the language and effect to be given K. S. A. 40-3113 (*a*). The court found the section violated the due process and equal protection clauses of the Fifth and Fourteenth Amendments to the United States Constitution, and Article 2, Section 17 and Sections 1, 2 and 18 of the Bill of Rights of the Constitution of the state of Kansas. The denial of due process and equal protection resulted from the use of the word "damages" in the second sentence of the statute.

When a statute is susceptible of more than one construction, it must be construed to give expression to its intent and purpose, even though such construction is not within the strict literal interpretation of the statute. (*Gnadt v. Durr*, 208 Kan. 783, 494 P. 2d 1219.) While the scrivener could well have used the term "benefits" instead of "damages," we think the legislative intent is clear. They key word in the second sentence is "repay." To repay requires that the insured receive duplicate payments. The section, in its entirety, was designated to prevent duplicative recovery. The section is not so vague as to render it unconstitutional.

Defendant further contends the district court erred in construing the language and effect of K. S. A. 40-3117—the effective no-fault law for the first 53 days of 1974. The court found those provisions denied Kansas residents equal protection and due process of law as guaranteed by the Constitution of the United States and the Constitution of Kansas.

K. S. A. 40-3117 (*a*) established a tort exemption to the extent that personal injury protection benefits were paid for injury. No tort exemption is provided where an injured person is able to sue for non-pecuniary losses under the provision of subsection (*b*).

An injured person may nevertheless sue for economic losses in excess of the PIP benefits received. K. S. A. 40-3117 (*b*) provides that in any action for tort against an owner, operator or occupant of a motor vehicle covered by a liability insurance policy containing PIP coverage, a plaintiff may receive damages for nonpecuniary losses only in the event his medical expense exceeds $500, or he suffers a specified injury.

Again, no useful purpose would be served by an extended discussion of the hypothetical automobile accident cases utilized by the district court in finding Section 17 (K. S. A. 40-3117) of the Act unconstitutional. While K. S. A. 40-3104 requires that every motor vehicle owner secure the required no-fault liability insurance, there may be owners who will not obtain such insurance until after proceedings to suspend their vehicle registration have been commenced. In addition, the staggered system of motor vehicle registration in Kansas will permit non-compliance by some Kansas residents for an interim period. K. S. A. 40-3117 may result in some inequality between Kansas residents because of those resident motor vehicle owners who may prefer risking criminal liability to securing no-fault insurance. To permit such persons to frustrate the purpose of the no-fault Act (K. S. A. 40-3101 *et seq.*) and deny the public the benefits derived from that Act, would render any legislative reparation reform, a nullity. In sum, the effect of K. S. A. 40-3117 has not been shown to be invidiously discriminatory, and we conclude the plaintiff and intervenor have failed to show the statute is unconstitutional in its operative effect.

The result of the foregoing discussion is that the provisions of Substitute for House Bill 1129 (K. S. A. 40-3101 *et seq.*) and its application for the first 53 days of 1974—from January 1, 1974 to February 22, 1974—were not unconstitutional in any respect and were the effective no-fault law of this state during such period and until repealed in its entirety by Senate Bill 918 on February 22, 1974.

The court is of the opinion that the provisions of Senate Bill 918 containing basic no-fault concepts as set forth and discussed above, are not unconstitutional for any of the reasons urged by the parties upon the grounds they violate the due process and equal protection clauses of the Kansas Constitution or the Fourteenth Amendment to the Constitution of the United States, or any of the other provisions of the state or federal constitutions urged.

It follows that the judgment of the district court is reversed with directions to set aside the injunction issued by that court on January 24, 1974, and enter judgment for the defendant state officials in accordance with the views expressed in this opinion.

It is so ordered.

FROMME, J., dissenting and concurring in part. The Kansas automobile injury reparations act states:

"The purpose of this act is to provide a means of compensating persons promptly for accidental bodily injury arising out of the ownership, operation, maintenance or use of motor vehicles in lieu of liability for damages to the extent provided herein." (Sec. 2.)

In the definition section of the act (Sec. 3 [m]) motor vehicle is defined as follows:

" 'Motor vehicle' means every self-propelled vehicle of a kind required to be registered in this state, including any trailer, semitrailer or pole trailer designed for use with such vehicle." (Sec. 3 [m].)

All parties agree that a motorcycle or motor-driven cycle is included in the general classification. It is equally agreed that the owner of a motorcycle or motor-driven cycle is required to provide motor vehicle liability insurance coverage under Section 4 (a) of the act. So the classification chosen by the legislature for compulsory insurance under the reparations act includes the owners of every self-propelled vehicle required to be registered in this state for use on the highways including without limitation Cadillacs, Volkswagens and motorcycles. The expressed purpose upon which the classification is based is to provide a *means of compensating persons promptly for accidental bodily injury arising out of ownership,* operation, maintenance or use of motor vehicles in lieu of liability for damages to the extent provided in the act.

The constitutional law rules relating to proper exercise of the police power for the public welfare are iterated in *Pinkerton v. Schwiethale,* 208 Kan. 596, Syl. ¶¶ 1, 2, 3, 4 and 5, 493 P. 2d 200. The classification provided in the present act appears reasonable when and if it includes owners of all motor vehicles using the highway. All such motor vehicles must be registered, are used on the public highways and their use causes damage and injuries. The prompt payment of benefits for accidental injury arising out of the use of a Cadillac, Volkswagen or motorcycle would seem to be equally in the public interest. I can accept the premise that this state has the power to legislate against what are found to be injuri-

ous practices in its internal and business affairs relating to the payment of claims for personal injuries by requiring compulsory liability insurance as a condition precedent to using the highways.

It is apparent if the state desires to assure prompt payment of claims this has to be done on the basis of first party insurance, such as the PIP benefits plan which requires the insured's own company to pay for the injuries. After the prompt payment is effected either the injured party or the company can then seek reimbursement from the tortfeasor. This would appear to be a plan which generally meets the "reasonable relation" test as regards the purpose of the act.

However, the classification to be employed in the exercise of the police power cannot be made arbitrarily. If there is invidious discrimination in setting up the classification this offends the "due process and equal protection" clause of the United States Constitution (Amendment 14, § 1). Any distinctions inherent in the particular classification must furnish a proper and reasonable basis for such distinctions. To have a proper and reasonable basis any person granted an exemption from the class must be so situated that there is a ground of difference for the exemption related to the objects of the legislation. (*Pinkerton v. Schwiethale,* supra.)

I can find no ground of difference for the favored exemption of the owners of motorcycles and motor-driven cycles relating to the objects of the legislation. After including them in the class required to purchase liability insurance under Section 4 (*a*) of the act the legislature placed such owners in a favored sub-classification so far as PIP benefits are concerned by including the special proviso in Sec. 7 (*f*) as follows:

"*Provided,* That the owner of a motorcycle or motor-driven cycle, as said terms are defined by K. S. A. 1973 Supp. 8-501, who is the named insured, shall have the right to reject in writing insurance coverage including such benefits for injury to a person which occurs while he is operating or is a passenger on such motorcycle or motor-driven cycle; and unless the named insured requests such coverage in writing, such coverage need not be provided in or supplemental to a renewal policy when the named insured has rejected the coverage in connection with a policy previously issued by the same insurer. The fact that the insured has rejected such coverage shall not cause such motorcycle or motor-driven cycle to be an uninsured motor vehicle; and"

By rejecting PIP benefit coverage the owner of a motorcycle is not classified as owning an uninsured motor vehicle. Although the exception in Section 16 (*a*) (1) is unclear it would appear by the construction that the owner of a motorcycle who has rejected PIP

benefit coverage would not be covered under the assigned claims plan. In reading the threshold requirement of Section 17 no exception appears for owners of motorcycles so it follows they receive the protection of this threshold requirement and no recovery for damages in tort for pain and suffering, mental anguish, inconvenience and other non-pecuniary loss may be had unless the $500.00 medical threshold is exceeded. The net effect of this would place the owner of the motorcycle in a favored class. He may reject and not have to pay for PIP benefits premium yet he retains the full protection of the threshold requirement built into the act.

In 16 Am. Jur. 2d, Constitutional Law, § 500, p. 874, it is said:

". . . The legislature cannot take what might be termed 'a natural class of persons,' split that class in two, and then arbitrarily designate the dissevered factions of the original unit as two classes and thereupon enact different rules for the government of each. Any law that is made applicable to one class of citizens only must be based on some substantial difference between the situation of that class and other individuals to which it does not apply, and must rest on some reason on which it can be defended. In other words, there must be such a difference between the situation and circumstances of all the members of the class and the situation and circumstances of all other members of the state in relation to the subjects of the discriminatory legislation as presents a just and natural reason for the difference made in their liabilities and burdens and in their rights and privileges. The reason for a classification must inhere in the subject matter, must be natural and substantial, and must be one suggested by such a difference in the situation and circumstances of the subjects placed in different classes as suggests the necessity or propriety of different legislation with respect to them. . . ."

There must be a proper relationship between differences to split up a classification and that relationship must bear upon the object for which the classification was made in the first place. This is explained in 16 Am. Jur. 2d, Constitutional law, § 501, p. 875, in these words:

"The standard by which the sufficiency of those differences which form a valid basis for classification may be measured has been repeatedly stated by the courts in many formulas which vary slightly in detail but contain substantially the same elements. The objects and purposes of a law present the touchstone for determining proper and improper classifications, and a classification to be valid must always rest on a difference which bears a fair, substantial, natural, reasonable, and just relation to the object for which it is proposed. . . ."

In *State v. Haun*, 61 Kan. 146, 59 Pac. 340, 47 L. R. A. 369, the miners' "Scrip Law" was struck down as unconstitutional and void because of the unjust discrimination built into the class sought to be affected. The obvious intent of the act was to protect the

laborer and not to benefit the corporation. The court could see no reason to protect employees working for a corporation with 10 or more on the payroll and not equally protect the employees of those corporations hiring less than 10 employees. The sub-class built into the classification was held to be unnatural, unreasonable and having no relationship to the obvious intent of the act.

In *City of Derby v. Hiegert*, 183 Kan. 68, 325 P. 2d 35, this court struck down an anti-peddler ordinance because of improper classifications. In the opinion it is pointed out:

"It is apparent that the ordinance involved herein creates an unlawful classification, discriminatory in nature, which renders the ordinance invalid. Section 3 provides that the ordinance shall not apply to religious, charitable or community service organizations. There is no reasonable ground upon which this classification can be made. It bears no relation to the object and purposes of the ordinance. Its only effect is to permit one class to violate the provisions of the penal ordinance without penalty and to hold another class strictly responsible thereto. If the purpose of the ordinance is to protect the householder from uninvited intrusions against his peace and comfort and the possibility of the imposition of fraud, the exceptions in section 3 completely destroy such purpose. Certainly the knock on the door or the ring of the doorbell for the sale of goods, wares and merchandise by a solicitor for a religious, charitable or community service organization is as great a disturbance to the householder's privacy and comfort as that by the commercial solicitor. Similarly, the danger of fraud, over-persistent selling methods and financial irresponsibility is as great in the activities of those which section 3 purports to exempt as in the activities of those covered by secton 1." (p. 70.)

In *State, ex rel., v. Consumers Warehouse Market*, 185 Kan. 363, 343 P. 2d 234, this court considered the classifications used in the "Unfair Practices Act" and held the portion of the act which exempted "grain and feed dealers" from the scope and operation of the act constituted an unreasonable, arbitrary and fictitious classification having no reasonable and substantial relation to the purposes of the act and the subject matter thereof. In the opinion at pp. 369 and 370 it is stated:

"Concededly, a state has a broad discretion in classification in the exercise of its power of regulation, and the Constitution of the United States does not require that things which are different in fact are to be treated in law as though they were the same, but discrimination in a state regulatory statute must be based on differences that are reasonably related to the purpose of the statute, and the constitutional guaranty of equal protection of the laws is interposed against discriminations that are entirely arbitrary. Distinctions cannot be justified if the discrimination has no reasonable relation to the differences. [Citations omitted.]"

In the present case since the purpose of the act is specifically

stated in Section 2 we do not look beyond the language in the statute in search of the legislative purpose or extend the meaning of the statute beyond the plain terms of the act. (*Hunter v. Haun*, 210 Kan. 11, 499 P. 2d 1087.) As previously stated the legislative purpose is to provide a means of compensating persons promptly for accidental injury arising out of the ownership, operation, maintenance or use of motor vehicles. Considering such purpose, is there any less need for prompt payment of claims for personal injury arising out of the ownership and use of motorcycles as distinguished from other motor vehicles? I think not. There are facts and figures in the record before the court which indicate that based upon number of vehicles in operation on our highways the motorcycle accident rate is almost double that of other motor vehicles. The figures further indicate that there is a much greater incidence of fatalities and injury accidents for those traveling on motorcycles. Some of the figures on motorcycles such as those listed by Mr. Justice Schroeder in *City of Wichita v. White*, 205 Kan. 408, 410, 469 P. 2d 287, are thought provoking. It is a gross understatement when we say the statistics on injury accidents involving motorcycles would seem to indicate as great a need for prompt payment of claims as do the statistics on other motor vehicle accidents.

What then justifies the favored treatment in the act of owners of motorcycles? Why should they be singled out from other motor vehicle owners and be given the right to reject PIP benefit coverage? This cannot be based upon less need for prompt payment of injury claims, the stated purpose of the act, for they have more injury accidents per registered vehicle than any other motor vehicle.

Although the parties to this action do not express any real reason for the preferred treatment and the record discloses no reason it might be inferred that insurance premiums for this first party coverage might be much higher in cost than for other motor vehicles. If that be the reason for their exemption from mandatory PIP coverage it has no reasonable and substantial relation to the purposes of the act or the subject matter thereof. It is no more reasonable to exempt the owners of motorcycles from mandatory PIP coverage because of premium cost than it would be to exempt the owners of Volkswagens and other small foreign cars from such coverage because the incidence of personal injury accidents are greater in those cars than in Cadillacs. Premium costs are presumably based upon loss ratio and loss ratio has

nothing to do with the desire expressed by the legislature to provide a means of prompt payment of personal injury claims. Every motor vehicle owner chooses his own make and model of vehicle which he uses on the highways. Insurance premium costs will vary but they bear no relationship to the purpose for which the Kansas automobile injury reparations act was passed. You cannot exempt from such an act those owners residing in highly concentrated urban areas on the ground their premiums are higher than those of owners living in the rural areas in the western third of the state. Neither can you exempt the owners of motorcycles because of possible higher premium costs.

Section 7 (f) and Section 16 (a) (1) of the Kansas automobile injury reparations act create a preferred sub-classification for owners of motorcycles and motor-driven cycles, violate the "due process and equal protection" clause of the United States Constitution (Amendment 14, § 1) in that said sub-classification amounts to invidious discrimination and are arbitrary and without a proper and reasonable basis considering the purpose of the act as expressly stated therein. Those provisions should be held null and void.

Section 21 of the act provides:

"If any provisions of this act, or the application thereof to any person or circumstance, is held unconstitutional, the remainder of this act and the application of such provision to other persons or circumstances shall not be affected thereby; and it shall be conclusively presumed that the legislature would have enacted the remainder of this act without such invalid or unconstitutional provision: *Provided,* That section 17 is expressly declared to be nonseverable."

In view of the severability built into the act by the legislature I would strike down those provisions giving separate and preferred treatment to the owners of motorcycles and permit the balance of the act to stand in accordance with the views expressed in the majority opinion.

FONTRON and OWSLEY, J. J., join in the foregoing dissent.

PRAGER, J.: Concurring and dissenting. I respectfully dissent from syllabi 10 and 16 and the corresponding portions of the majority opinion which uphold the constitutionality of the "threshold provision" of section 17 of the two statutes involved in this case. I have no quarrel with the remaining syllabi and corresponding portions of the opinion. In my judgment the "threshold provision"

is constitutionally impermissible as a denial of "remedy by due course of law" guaranteed by Section 18 of the Kansas Bill of Rights. Furthermore I am convinced that such provision creates arbitary and discriminatory classifications in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution and Sections 1 and 2 of the Kansas Bill of Rights.

Section 18 of the Kansas Bill of Rights declares as follows:

"All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

The "threshold provision" abolishes the right of a person to recover for pain and suffering and other non-pecuniary loss incurred in an automobile accident unless the medical expenses incurred have a reasonable value of $500 or more or unless certain specified injuries result therefrom. The record before the court in my opinion does not reasonably justify the conclusion that the purpose and benefits sought by the legislation could not be fully attained by the requirement of first party accident insurance coverage without the threshold provision.

The exercise of the police power by legislative act depends for its validity upon whether the means employed are reasonably necessary to accomplish the ends in view; and whether the regulations proposed are reasonable, in turns depends upon the seriousness of the evil to be overcome, the magnitude of the curtailment of individual rights affected, and the availability and effectiveness of other less drastic measures. (*Goldblatt v. Hempstead*, 369 U. S. 590, 595, 8 L. Ed. 2d 130, 82 S. Ct. 987.) I fully recognize the broad power of both the legislature and the courts to make reasonable changes in the substantive and procedural law when the public good requires it. I cannot, however, accept the view that the legislature may destroy or seriously restrict a traditional and long standing cause of action upon mere legislative whim, or when an alternative approach is available. There should be some compelling public interest to justify such drastic action.

At the beginning of this century the Kansas legislature sought to curtail the right of our citizens to sue in the courts of this state to recover general damages by way of mental suffering and anguish and personal and public humilitation, resulting from the malicious publication of false and libelous matters by newspapers. In 1904 in *Hanson v. Krehbiel*, 68 Kan. 670, 75 Pac. 1041, we held that stat-

ute unconstitutional as being in conflict with Section 18 of the Kansas Bill of Rights in that it denied in certain cases to one injured in his reputation a remedy therefor by due course of law. Syllabus ¶ 3 of *Hanson* might well have been written to cover the legislation now before us in 1974. That syllabus reads as follows:

"3. *Constitutional Right Not Satisfied by Statute.* The right to a remedy by due course of law is not satisfied by the requirement contained in a statute to make specific reparation for the injury done, which reparation is the same in all cases, bears no relation to the injury suffered, and has not been decreed by a tribunal after ascertainment of the extent of such injury."

It is clear from a careful analysis of the no-fault legislation that those statutes make a specific reparation for the injury done; that the reparation is the same in all cases; that the reparation bears no relation to the injury suffered and that such reparation has not been decreed by a tribunal after ascertainment of the extent of such injury.

It has always been a maxim of Anglo-American jurisprudence that the law does not suffer a wrong without a remedy. We have held that Section 18 guaranteeing to every person a remedy by due course of law for injury done him in person or property means that for such wrongs that are recognized by the law of the land the courts shall be open and afford a remedy, or that laws shall be enacted giving a certain remedy for all injuries or wrongs. We have further declared that it is the primary duty of the courts of this state to safeguard the declaration of right and remedy guaranteed by the constitution insuring a remedy for all injuries. (*Noel v. Menninger Foundation,* 175 Kan. 751, 267 P. 2d 934; *Neely v. St. Francis Hospital & School of Nursing,* 192 Kan. 716, 391 P. 2d 155.) In *Neely* we emphasized that the provisions in Section 18 of the Bill of Rights guaranteeing to persons a *remedy* by due course of law cannot be watered down by diluting the definition of "remedy" to mean something other than a *judicial* means or method for enforcing a right or redressing a wrong. The Kansas no-fault legislation does not provide such a judicial method.

In these days when the rights of the individual are being eroded by continually encroaching claims of public interest and public need, the courts of this state must carry out their constitutional responsibility to protect and safeguard the rights afforded the people by the United States and Kansas Constitutions. I agree with the Supreme Court of Florida that the legislature is without power to abolish a right or legal remedy existing at common law

without providing a reasonable alternative to protect the rights of the people of the state to redress for injuries, unless the legislature can show an overpowering public necessity for the abolishment of such right, and that no alternative method of meeting such public necessity can be shown. (*Kluger v. White*, 281 So. 2d 1, declaring the "threshold provision" of the Florida no-fault statute unconstitutional in 1973.) Even though the legislative purpose is legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties or rights when the end can be more narrowly achieved. The breadth of legislative adbridgment must be viewed in the light of less drastic means for achieving the same basic purpose. (*Shelton v. Tucker*, 364 U. S. 479, 5 L. Ed. 2d 231, 81 S. Ct. 247.) I have no quarrel with the proposition that improvements are necessary in the judicial system of this state or that some type of no-fault legislation might improve the system now provided for making reparations to persons injured in automobile accidents. I do not in this dissent oppose the basic concept of no-fault. I do strongly oppose, however, statutory provisions which violate basic rights of Kansas citizens.

The purpose of the no-fault legislation is set forth in section 2 of both acts. These sections provide:

"The purpose of this act is *to provide a means of compensating persons promptly for accidental bodily injury arising out of the ownership, operation, maintenance or use of motor vehicles* in lieu of liability for damages to the extent provided herein." (Emphasis supplied.)

The record does not show that the "threshold provision" is reasonably necessary to accomplish the legislative purpose. It seems clear to me that the provisions which make compulsory first party insurance coverage fully accomplish the legislative purpose of compensating persons promptly for bodily injury arising out of the operation of motor vehicles. Since all owners of motor vehicles are required to buy such insurance coverage (and at least supposedly will be protected thereby), what is the reasonable basis for restricting their right to proceed against the negligent driver in the courts of this state? It has been suggested that restricting the right of our citizens to sue will have the salutory effect of reducing the insurance premium which must be paid to purchase this kind of insurance. I question whether such a reason establishes an overpowering public necessity justifying the abolishment

of the right of injured persons to sue for pain and suffering except in certain limited cases.

Also on the question of the public necessity for no-fault legislation I think it important to note that in the trial court the parties stipulated and agreed that there is *no serious* court congestion problem in this state arising from automobile collision litigation and further that automobile insurance premiums are not "spiraling out of control" in this state. Furthermore the district court specifically found on the uncontradicted testimony of W. Fletcher Bell, Kansas Commissioner of Insurance, that the adoption of the no-fault plan in Kansas will result in an *increase* in the cost of automobile insurance premiums in this state. The finding of the trial court that automobile collision litigation does not present a serious congestion problem to the Kansas court system is fully supported and substantiated by the statistical report of the office of the Judicial Administrator of Kansas. For 1973 only 4.5 percent of the total cases commenced in the Kansas district courts involved automobile collisions. As of July 1, 1973, only 9.1 percent of total cases pending in the district courts were automobile collision cases. In view of these undisputed findings of the trial court that there is *no* serious court congestion problem in Kansas, that automobile insurance premiums are *not* spiraling out of control in Kansas, and that the adoption of the no-fault plan would actually increase the cost of automobile insurance, I fail to see any justification whatsoever for abolishing the right of our citizens to sue for pain and suffering and other non-pecuniary damages except in certain restricted cases. I agree wholeheartedly with the statement of Justice William A. Grimes and Justice Laurence I. Duncan of the Supreme Court of New Hampshire that "society cannot escape its responsibility to provide justice by simply eliminating the rights of its citizens." (*Opinion of the Justices*, _____ N. H. _____, 304 A. 2d 881.)

I do not believe that the record supports the conclusion that the legislature has provided a reasonable alternative method to justify the partial abolition of the right to sue to recover damages for personal injuries. The appellants argue here that the legislature has provided an appropriate remedy to persons injured in automobile collisions by making possible prompt payment of benefits under the first party insurance coverage. Let us examine this statement more closely. The owner of an automobile is not *given* anything! He is required *to pay out of his own pocket* the cost of first

party insurance to provide benefits to him in the event of personal injury arising from an automobile accident. What has he received by way of a *quid pro quo* in exchange for the elimination of his right to resort to the courts to recover for his pain and suffering and other non-pecuniary losses? He has received nothing from anyone. He has simply been forced to give up a valuable right and remedy and in lieu therefor has been compelled to purchase at his own expense first party insurance coverage. I simply cannot accept the proposition that under these circumstances the legislature has provided a reasonable alternative remedy to justify the partial abolishment of his remedy at law.

I am also convinced that the threshold provision is invalid as a denial of equal protection of the law under the Fourteenth Amendment to the United States Constitution and Sections 1 and 2 of the Bill of Rights of the Kansas Constitution. In *Henry v. Bauder*, 213 Kan. 751, 518 P. 2d 362, we held that a classification of persons in the exercise of the police power cannot be made arbitrarily and that there must be some rational basis for the classification. I am convinced from the evidentiary record before the court that there is no rational basis for treating a person who has suffered personal injury in an automobile collision whose medical expenses are less than $500, any differently than a person suffering a similar injury who has expended $500 or more for medical expenses. Furthermore I do not believe that there is any rational basis for treating a person who has suffered personal injury in an automobile collision differently than persons who have sustained personal injuries in other types of accidents. I frankly cannot see how such a discrimination has any reasonable basis to accomplish the purpose of no-fault legislation—to provide a means of compensating persons promptly for bodily injury arising out of automobile accidents. If there is such a rational basis neither the briefs of counsel nor the majority opinion of the court have shown to me what it is. For the reasons set forth above I respectfully dissent.